**CROW TRIBE OF INDIANS,**
**Plaintiff-Appellant,**

v.

**STATE OF MONTANA, and Ramon Dore, Director, Montana Department of Revenue, Defendants-Appellees.**

No. 79–4321.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1980.
Decided July 13, 1981.

Richard A. Baenen, Wilkinson, Cragun & Barker, Washington, D. C., argued, for plaintiff-appellant; Thomas J. Lynaugh, Lynaugh, Fitzgerald, Schoppert & Skaggs, Billings, Mont., Edward M. Fogarty, Wilk-

inson, Cragun & Barker, Washington, D. C., on brief.

Helena S. Maclay, Missoula, Mont., for defendants-appellees.

Before TANG, FLETCHER and ALAR-CON, Circuit Judges.

FLETCHER, Circuit Judge:

In 1975, Montana imposed severance and gross proceeds taxes on all coal mined and sold in Montana, including coal mined by non-Indians from the Crow Indian Reservation and from deposits held in trust for the Crow Tribe of Indians (Tribe). The Tribe sought injunctive and declaratory relief against the imposition of taxes on the production of non-Indian mineral lessees. The district court, 469 F.Supp. 154, dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted, and the Tribe now appeals. Our jurisdiction is based on 28 U.S.C. § 1291.

We hold that even though the incidence of these taxes falls upon non-Indian lessees, the Tribe has alleged facts that, if proved, would establish that the taxes are preempted by the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (1976), and that the taxes infringe upon the Tribe's right to govern itself. Accordingly, we reverse and remand.

### I.

Vast deposits of coal underlie both the Crow Reservation proper and an adjacent area known as the "ceded strip." The ceded strip consists of about 1,137,500 acres that were originally part of the reservation. The Crow Tribe ceded its interest in the surface estate of the area to the United States in 1904 in order to open the area to non-Indian entry and settlement, pursuant to the Act of April 27, 1904, ch. 1624, 33 Stat. 352. Although surface interests were thereafter conveyed to non-Indians, *see Cady v. Morton*, 527 F.2d 786, 789 (9th Cir. 1975), rights to minerals underlying the ceded strip were in large part retained by the United States for the benefit of the Tribe. We held recently that the ceded area is not a part of the reservation. *Little Light v. Crist*, 649 F.2d 683, 685 (9th Cir. 1981). Regardless of the status of the ceded strip, however, the underlying minerals are held by the United States Government in trust for the Tribe.

Since 1967, the Secretary of the Interior has actively encouraged the Tribe to develop its coal resources through the granting of prospecting permits and mining leases. The leasing activity has taken place under the aegis of the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (1976), and the regulations promulgated under the Act, 25 C.F.R. §§ 171.1–.30 (1980).

In 1972, Westmoreland Resources, a non-Indian company, entered into two mining leases with the Crow Tribe that embraced coal underlying about 31,000 acres of the ceded strip. The Tribe has also granted prospecting permits to and entered into leases with other non-Indian companies. To date, only Westmoreland Resources has actually mined coal under the leases.

In 1975, Montana enacted statutes that impose on coal mine operators a severance tax on each ton of coal produced in the state and a gross proceeds tax on the sale of each ton of coal produced in the state. 4 Mont. Code Ann. §§ 15–35–101 through 15–35–111 and §§ 15–23–701 through 15–23–704 (1979) (formerly Mont.Rev. Code Ann. §§ 84–1312 through 84–1325 (1947)). Westmoreland Resources has been paying Montana's severance and gross proceeds taxes since 1975. Because Westmoreland Resources falls into the highest statutory classification, that of one who surface mines high-quality coal, it is required to pay a severance tax equal to 30 per cent of the value of the coal mined. Since 1975, Westmoreland has paid $27 million in severance taxes and $3 million in gross proceeds taxes. During the same period, Westmoreland has paid about $8 million in royalties to the Tribe under the terms of its leases.

On January 31, 1976, the Tribe enacted its own coal tax code which provides for a severance tax of 25 per cent of the value of

coal mined by the Tribe's lessees. At present, the tribal severance tax applies only to coal mined on the reservation, and not to coal mined on the ceded strip.[1]

## II

The Montana Coal Severance Tax, Mont. Code Ann. § 15–35–103, is "imposed on each ton of coal produced in the state." "Produced" means "severed from the earth." Mont. Code Ann. § 15–35–102. The tax is measured by the value of the "contract sales price" of the coal, which is defined as "the price of coal extracted and prepared for shipment f.o.b. mine, excluding that amount charged by the seller to pay taxes paid on production." *Id.* The rate of tax varies from 3 to 30 per cent of the value of the coal, depending upon the quality of the coal and whether the mine is a surface or an underground mine. Mont. Code Ann. § 15–35–103. The tax is paid quarterly directly to the Montana Department of Revenue by each coal mine operator. Mont. Code Ann. § 15–35–104.

Montana has made elaborate provision for the disposition of funds gained through the coal severance tax. The major recipient is a special trust fund created by the Montana Constitution. Mont. Const. art. IX, § 5. The fund contains only monies collected pursuant to the severance tax. The principal of the fund may only be invaded on a three-fourths vote of the Montana legislature. The legislature may, however, appropriate the interest and income earned by the fund. Twenty-five per cent of the coal severance tax monies collected prior to December 31, 1979 were to go directly to the trust fund; 50 per cent of the collections after that date go into the fund.

The remaining severance tax monies are allocated to a variety of uses. The largest single use is a "local impact and education trust fund account," which is to receive between 26 and 37½ per cent of revenues. The remaining revenues go to state equalization aid to public schools, a coal area highway improvement fund, archeological preservation, various cultural projects, park acquisition and management, an alternative energy research fund, the general funds of the counties where the coal is mined, county land planning, and a sinking fund servicing renewable resource development bond accounts. Mont. Code Ann. § 15–35–108.

The Gross Proceeds from Coal Tax is imposed on "each person engaged in mining coal." Mont. Code Ann. § 15–23–701. Each person mining coal must file with the State Department of Revenue an annual report that must include, *inter alia*, a statement of the number of "tons of coal extracted, treated, and sold from the mine during the taxable period" and "the gross yield or value in dollars and cents derived from the contract sales price." *Id.* The Department of Revenue transmits to the county assessor of each county in which the coal mines are located the valuation of the gross proceeds of the mine. Mont. Code Ann. § 15–23–702. The county assessor then enters the value on an assessment roll, *id.*, and transmits a tax assessment to the county treasurer, who collects the taxes due from the coal operator. Mont. Code Ann. § 15–23–703.

## III

The litigants ask us to make difficult determinations concerning the limits of state power to tax Indians and Indian-related activities. Although the issue before the Supreme Court in *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), was the narrow one of whether a state may tax reservation Indians for income earned on the reservation, the Court used the occasion to describe the analytical context in which such questions are to be viewed.

The Court in *McClanahan* stated that, in recent years, "the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." 411 U.S. at 172, 93 S.Ct. at 1262. The Court noted, however, that it would be a vast oversimplification to say that nothing is left of the

---

1. *See* note 19 *infra.*

doctrine of Indian sovereignty. *Id.* at 170, 93 S.Ct. at 1261. The doctrine remains relevant as a "backdrop against which the applicable treaties and federal statutes must be read." *Id.* at 172, 93 S.Ct. at 1262. The Court made the further observation that because the federal treaties and statutes in almost all cases do define the boundaries of federal and state jurisdiction, the extent of federal preemption and residual Indian sovereignty in the absence of federal legislation or treaty is essentially moot. *Id.* at 172 n.8, 93 S.Ct. at 1262 n.8. Finally, the Court in *McClanahan* stated that, if the state action is not preempted by federal legislation or treaty, the state need only satisfy the test laid down in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1958), that state action must not infringe on the rights of reservation Indians to govern themselves. *Id.* at 171–72, 93 S.Ct. at 1261–1262.

■ Although the Court in *McClanahan* stated that tribal immunity from state taxation does not rest primarily on any inherent tribal sovereignty, we note that remnants of the sovereignty rationale are implicit in the holding of *McClanahan* in the form of certain presumptions. Direct state taxation of tribal property or the income of reservation Indians is presumed to be preempted, absent express congressional authorization. *Bryan v. Itasca County,* 426 U.S. 373, 376–77, 96 S.Ct. 2102, 2105–2106, 48 L.Ed.2d 710 (1976); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 475–81, 96 S.Ct. 1634, 1642–1645, 48 L.Ed.2d 96 (1976); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). In contrast, state taxation of non-Indian activities on the reservation can proceed without express congressional authorization, even if the taxation affects Indians in some way. *See Washington v. Confederated Tribes of Colville,* 447 U.S. 134, 148, 100 S.Ct. 2069, 2078, 65 L.Ed.2d 10 (1980). It is enough that such taxation does not conflict with federal statutes or treaties or interfere to an impermissible extent with the ability of the tribe to govern itself.

■ In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), the Supreme Court discussed the principles of preemption to be applied in a case such as this. The Court noted that the test of whether a state law concerning Indians has been preempted is different from the test used to find federal preemption in other contexts. *Id.* at 140, 100 S.Ct. at 2582. The tradition of Indian independence from state control and the broad federal policies to the same end (the "backdrop" of Indian sovereignty described in *McClanahan*) color the way in which we view federal statutes and regulations affecting Indians. *Id.* The Court found that Congress intended broad preemptive effect to be accorded federal statutes and regulations when the state action in question threatens the "firm federal policy of promoting tribal self-sufficiency and economic development." *Id. See generally* D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 295–99 (1979). No express congressional statement of preemptive intent is required; it is enough that the state law conflicts with the purpose or operation of a federal statute, regulation, or policy.[2] On the other hand, legitimate interests of the state must be considered, and the ultimate result where the conduct of non-Indians on the reservation is involved depends on "a particularized inquiry into the nature of the State, Federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 149, 100 S.Ct. at 2586.

■ The accommodation of state and tribal interests is also central to the analysis of whether a state law infringes upon the right of reservation Indians to "make their own laws and be ruled by them." *Wash-*

---

**2.** Of course, state law will be preempted where Congress expressly so provides, or where the federal regulation is of such breadth that it occupies the field, leaving no room for state involvement.

*ington v. Confederated Tribes of Colville,* 447 U.S. 134, 156, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980) (quoting *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959)). The self-government doctrine differs from the preemption analysis in that it specifically prohibits state action that impairs the ability of a tribe to exercise traditional governmental functions such as zoning, *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 663–64 (9th Cir. 1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977); vehicle registration, *Red Lake Band of Chippewa Indians v. Minnesota,* 311 Minn. 241, 248 N.W.2d 722 (1976), or the exercise of general civil jurisdiction over the members of the tribe, *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Littell v. Nakai,* 344 F.2d 486 (9th Cir. 1965), *cert. denied,* 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966); *White v. Califano,* 581 F.2d 697 (8th Cir. 1978); *California v. Quechan Tribe,* 424 F.Supp. 969 (S.D.Cal. 1977), *vacated on other grounds,* 595 F.2d 1153 (9th Cir. 1979) (tribe's sovereign immunity barred suit); *United States ex rel. Rollingson v. Blackfeet Tribal Court,* 244 F.Supp. 474 (D.Mont. 1965). *See also Arizona ex rel. Merrill v. Turtle,* 413 F.2d 683 (9th Cir. 1969), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970) (state has no authority to extradite Indians living on reservation). At base, however, the right of tribal self-government is a federal policy established by and subject to the will of Congress. Although self-government is related to federal preemption in the sense that both depend on congressional action and in the sense that preemption is considered in the context of the deeply ingrained traditional notions of self-government, the self-government doctrine is an independent barrier to state regulation. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. at 140, 100 S.Ct. at 2582.

**IV**

The Tribe initially argues that the incidence of Montana's taxes is on the Tribe. The tax is invalid, the Tribe contends, because Congress has not authorized the direct taxation of tribal mineral holdings, as required by the Supreme Court's rulings in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973), and *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

█ This court must look to the operation of the taxing statutes to determine which party the Montana legislature intended to be liable for the tax. We find that the incidence of these taxes is on the non-Indian mineral lessee. Neither of the taxes is collected from the owner of the mineral rights *in situ* (unless the owner also happens to be the producer),[3] and the tax is not required by law to be passed on to the owner or to any other party. *See American Oil Co. v. Neill,* 380 U.S. 451, 455–56, 85 S.Ct. 1130, 1133–1134, 14 L.Ed.2d 1 (1965); *First Agricultural Nat'l Bank v. State Tax Comm'n,* 392 U.S. 339, 346–47, 88 S.Ct. 2173, 2177–2178, 20 L.Ed.2d 1138 (1968); *Federal Land Bank v. Bismarck Lumber Co.,* 314 U.S. 95, 99, 62 S.Ct. 1, 3, 86 L.Ed. 65 (1941). Nor is the Tribe subject to any reporting requirements in connection with the tax. Furthermore, we note that the Montana Supreme Court has held that the severance tax is levied on the producer, and that the taxable event is the act of severance. *Commonwealth Edison Co. v. Montana,* 615 P.2d 847, 850, 857 (Mont.1980), *prob. juris. noted,* —— U.S. ——, 101 S.Ct. 607, 66 L.Ed.2d 494 (1980). The Tribe is not obligated to pay the taxes, and it cannot be held liable for deficiencies.[4]

█ The extent to which the economic burden of the tax is passed on to the Tribe

---

3. The Tribe has not alleged that it has mined any coal itself or that it has paid any taxes directly to the State of Montana.

4. The coal mines themselves, however, are subject to the imposition of liens in the event the taxes are not paid. Mont. Code Ann. § 15–23–704. We are not called upon to express a view on the validity of this provision as applied to Indian coal *in situ.*

in the form of decreased royalties is not relevant to the limited inquiry we make here to determine the legal incidence of the tax. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 481-82, 96 S.Ct. 1634, 1645–1646, 48 L.Ed.2d 96 (1976); *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253, 1255 n.2, 1256 (9th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977); *Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972); *Mescalero Tribe v. O'Cheskey*, 625 F.2d 967, 970 (10th Cir. 1980). *See also United States v. County of Fresno*, 429 U.S. 452, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977); *Gurley v. Rhoden*, 421 U.S. 200, 204, 207, 95 S.Ct. 1605, 1608, 1610, 44 L.Ed.2d 110 (1975); *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 382 n.12, 84 S.Ct. 378, 390 n.12, 11 L.Ed.2d 389 (1964); *Connecticut General Life Ins. Co. v. Johnson*, 303 U.S. 77, 80, 58 S.Ct. 436, 438, 82 L.Ed. 673 (1938); *Lash's Prods. Co. v. United States*, 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251 (1929).

■ The Tribe argues that the ultimate intent of the Montana legislature was to tax the coal itself and thereby raise revenue, regulate the rate of production, and preserve the value of the natural resource. Our inquiry into the legislature's intent in this regard is limited to ascertaining the legal obligations imposed upon the concerned parties, however, and does not extend to divining the legislature's "true" economic object. *Gurley v. Rhoden*, 421 U.S. 200, 204–07, 95 S.Ct. 1605, 1608–1610, 44 L.Ed.2d 110 (1975). *See also United States v. Tax Comm'n of Mississippi*, 421 U.S. 599, 604–11, 95 S.Ct. 1872, 1876–1879, 44 L.Ed.2d 404 (1975); *American Oil Co. v. Neill*, 380 US. 451, 455–57, 85 S.Ct. 1130, 1133–1134, 14 L.Ed.2d 1 (1965); *Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 99, 62 S.Ct. 1, 3, 86 L.Ed. 65 (1941); *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). *But see United States v. City of Leavenworth*, 443 F.Supp. 274, 281–82 (D.Kan. 1977).[5]

## V

■ The Tribe argues that the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (1976),[6] and the regulations promulgated thereunder, 25 C.F.R. §§ 171.1–.30 (1980),[7] sweep so broadly through the area of Indian mineral leasing that there is no room for state involvement.[8] *See Warren*

---

**5.** . The Tribe also argues that Montana's taxes violate section 4 of the Enabling Act pursuant to which Montana was admitted to the Union. Section 4 provides:

Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States ....

Act of February 22, 1889, ch. 180, § 4, 25 Stat. 676. This disclaimer was adopted and ratified in Montana's original constitution, Mont. Const. Ord. I, 2 (1889), and in the state's new constitution. Mont. Const. art. I (1972).

Because we find that the incidence of these taxes falls on the non-Indian mineral lessee, we see no conflict between the taxes and the Enab-

ling Act. *Truscott v. Hurlbut Land & Cattle Co.*, 73 F. 60 (9th Cir. 1896).

**6.** The 1938 Act originally excluded the Crow Reservation from its coverage. 25 U.S.C. § 396f. Until 1959, mineral leasing on the Crow Reservation was governed by section 6 of the Crow Allotment Act of 1920, ch. 224, § 6, 41 Stat. 751, as amended by the Act of May 26, 1926, ch. 403, 44 Stat. 658. In 1959, Congress amended section 6 of the Crow Allotment Act of 1920 to provide that mineral leases on Crow lands were to be governed by provisions of the 1938 Act. Act of September 16, 1959, Pub. L. No. 86–283, 73 Stat. 565. *See also* Act of May 17, 1968, Pub. L. No. 90–308, 82 Stat. 123.

**7.** See also 25 C.F.R. §§ 173.1–.29 (1980).

**8.** The Tribe also argues that the taxes are preempted by the Tribe's enactment of its own coal severance tax on the mining of coal underlying the reservation and ceded strip. Absent a demonstration of congressional intent to delegate authority to the Tribe to preempt Montana's taxing statutes, the tribal ordinances carry no such preemptive effect.

*Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Central Machinery Co. v. Arizona State Tax Comm'n*, 448 U.S. 160, 100 S.Ct. 2592, 2599, 65 L.Ed.2d 684 (1980). We need not view preemption as so comprehensive in this case because we find that the Tribe's allegations, if not controverted, would establish that the challenged Montana taxes directly and substantially thwart the policies underlying the Mineral Leasing Act of 1938.

■■■ The 1938 Act[9] was designed to achieve three goals. *See* H.R.Rep.No.1872, 75th Cong., 3d Sess. at 1–3 (1938); S.Rep. No.985, 75th Cong., 1st Sess. 2–3 (1937); United States Dep't of Interior, *Federal Indian Law* 695 n.45 (1958). First, the Act sought to achieve uniformity in the law governing mineral leases on Indian lands. Prior law had been a statutory hodgepodge that imposed different requirements for mineral leases on different Indian lands.[10] Second, the 1938 Act was designed to help achieve the broad policy of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (1976), that tribal governments be revitalized. In the mineral leasing context, this meant giving tribal governments control over decisions to lease their lands and over lease conditions, subject to approval of the Secretary of Interior, where before the responsibility for such decisions was lodged in large part only with the Secretary.[11] Third, the 1938 Act was intended to encourage tribal economic development, an important

The Tribe will have an opportunity to demonstrate on remand that Congress intended to delegate such regulatory and preemptive authority to the Tribe, and that there is a "direct conflict between state and tribal schemes." *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 156, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10. We note in this regard that 30 U.S.C. § 1300(a) (Supp.I 1977) indicates that Congress is contemplating a delegation to Indian tribes of some authority over surface mining on Indian lands. See note 17 *infra*.

9. The 1938 Act provides that an Indian tribe may lease its lands for mining purposes with the approval of the Secretary of the Interior. 25 U.S.C. § 396a. Section 396b provides for the sale of oil and gas mining leases under regulations to be prescribed by the Secretary. The Secretary is authorized to reject all bids and readvertise leases when in the Secretary's judgment that course would be in the Indians' best interests. With the Indians' consent, a lease may be privately negotiated. Section 396b also safeguards the rights of tribes organized under the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (1976), to enter into mining leases in accordance with the provisions of that Act and with their tribal constitutions and corporate charters. Other sections specify the type of bond to be furnished by the lessees and authorize the Secretary to promulgate regulations. 25 U.S.C. §§ 396c, 396d.

The regulations promulgated by the Secretary under authority of the 1938 Act cover many aspects of mineral leasing between tribes and non-Indian lessees, including the procedures for acquiring mineral leases, minimum rates for rentals and royalties and the manner in which payments are to be made, penalties for failure to comply with the terms of leases, information to be supplied by lessees, acreage limitations, inspections of lessees' records by Indian lessors or by Department of Interior officials, and cancellation of leases. 25 C.F.R. §§ 171.1–.30 (1980); *see also* 25 C.F.R. §§ 173.1–.29 (1980).

10. The 1938 Act achieved uniformity by including all tribally-owned (unallotted) lands, on or off the reservation, within its ambit, and by repealing "[a]ll Act [sic] or parts of Acts inconsistent herewith." Section 7 of the Act, 52 Stat. at 348 (not codified but set out at 25 U.S.C. § 396a note). The latter provision probably repealed the prior leasing statutes. *See* 84 Interior Dec. 905 (1977); *cf. Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 71, 66 L.Ed.2d 21 (1981) (No.80–11) (reserving the question). Since 1938, the Interior Department has operated under the 1938 Act with regard to Indian mineral leases. *See* 84 Interior Dec. 905 (1977).

11. Early Indian mineral leasing legislation placed varying amounts of control over leasing decisions with the Indian agent in charge of the reservation, 25 U.S.C. § 397 (1976), and with the Secretary of the Interior. 25 U.S.C. § 399 (1976). The latter statute contained no provision for Indian consent to the leases and permitted the Secretary to prescribe reasonable terms and conditions. Other statutes provided that Congress could appropriate lease revenues for various purposes. 25 U.S.C. §§ 400a, 398b.

Tribal control over resources was further diluted by holdings that the Secretary had no discretion in the granting of leases once land had been declared open for prospecting. In some cases, leases were granted over tribal objections. H.R.Rep.No.1872, 75th Cong., 3d Sess. at 2 (1938); S.Rep.No.985, 75th Cong., 1st Sess. at 2 (1937).

objective of the Indian Reorganization Act of 1934. Prior to the 1938 Act, the leasing of Indian lands for mining purposes was governed by mining laws applicable to public lands generally. Technical requirements and complicated procedures under these laws had prevented the leasing of much of the Indians' land, thus depriving them of considerable revenue. See H.R.Rep.No. 1872, 75th Cong., 3d Sess. at 2 (1938); S.Rep.No.985, 75th Cong., 1st Sess. at 2 (1937); 79 Cong.Rec. 7815 (1938) (remarks of Sen. Thomas); id. at 8307–08 (remarks of Sen. Thomas). The 1938 Act provided that the land was to be leased by the Indians on terms restricted only by regulations to be adopted by the Secretary pursuant to the Act.

■ If the allegations of the complaint are sustained at trial, the Montana Coal Severance Tax will conflict with the purposes of the 1938 Act in several respects. Most prominently, the magnitude of the tax will prevent the Tribe from receiving a large portion of the economic benefits of its coal. The Montana legislature predicated its tax upon a finding that strip coal

> is in sufficient demand that at least one-third of the price it commands at the mine may go to the economic rents of royalties and production taxes ....

Mont.Code Ann. § 15–35–101(1)(e).[12] By setting the severance tax rate at 30 per cent of value, Montana made plain its intention to appropriate most of the economic rent. The substantial adverse effect on the Tribe's potential revenues is obvious when the state takes such a large portion of this economic surplus.[13] The Tribe has alleged that, to date, Montana has realized $27 million from its severance tax while the Tribe has received only $8 million in royalties.[14]

■ Some economic impact on the Tribe can be justified if the state's interests in imposing the tax are legitimate. Of course, revenue raising to support government is a proper purpose behind most taxes. Montana's severance tax, however, has an unusual and additional purpose going far beyond revenue raising to support government. The legislative subcommittee that gave birth to Montana's system of coal taxation described the severance tax device as follows:

> Severance Taxes are levied upon a state's natural resources for several reasons. One, obviously, is the need for revenue. Another is that a state's natural resources, particularly its mineral resources, are nonrenewable. When the resources are mined, the state loses a valuable asset forever. The levying of a severance tax is one manner by which the state can share in the profits associated with the extraction of a mineral asset....

Subcommittee on Fossil Fuel Taxation, Montana Legislative Council, *Fossil Fuel Taxation* 3 (Dec. 1974 Interim Study). This

**12.** "Economic rent" is the amount of revenue that can be extracted from an activity, here in the form of royalties and taxes, without significantly discouraging production.

**13.** Montana argues that the Crow Tribe has not itself paid a penny in severance taxes, that Westmoreland is the only party that has been so burdened, and that the Tribe has therefore received everything to which it was entitled under the terms of the Westmoreland lease. Thus, the state contends, the Tribe has suffered no economic hardship from the tax.

The argument is unconvincing for several reasons. First, the Tribe's complaint asks for a declaration that the tax will not apply to production under future leases that the Tribe wishes to enter into. The Tribe has alleged that the tax will reduce the royalties future lessees would be willing to pay. In this regard, we note that Shell Oil Company has asserted in its *amicus* brief that Montana's taxes severely reduce the compensation Shell can offer the Tribe in its ongoing coal lease negotiations. Furthermore, the Tribe alleges that the royalties under the Westmoreland lease are subject to renegotiation every ten years, and that the Tribe could negotiate for a greater portion of the coal's value if the severance tax were declared to be inapplicable.

As to the taxes already paid by Westmoreland, however, it is true that the Tribe has not paid any of the taxes and is apparently not entitled to any refund if the tax statutes are declared invalid.

**14.** While none of the $27 million came out of the Crow Tribe's pocket, see note 13 supra, the disparity between the revenues of the state and those of the Tribe arguably indicates the extent to which the state is attempting to secure a large share of the economic surplus.

statement demonstrates a purpose to keep the value represented by the state's nonrenewable assets intact, for use by Montanans in the future. This purpose was implemented through the creation of the special trust fund under article IX, section 5 of the Montana Constitution. As discussed above, the fund is the major recipient of severance tax monies.[15] While the state may have an interest in perpetuating the value of mineral wealth subject to its general civil jurisdiction, it has no such legitimate interest in appropriating Indian mineral wealth.

 Furthermore, the severance tax is more than a revenue-raising device. It has regulatory purposes as well. The Subcommittee on Fossil Fuel Taxation, in describing the purposes behind severance taxes, stated

> A severance tax ... can help discourage resource waste; a basic assumption of severance taxation is that future generations will need mineral resources similar to those used today. By being production [sic], a severance tax can encourage producers to manage their operations efficiently.

Subcommittee on Fossil Fuel Taxation, Montana Legislative Council, *Fossil Fuel Taxation* 3–4 (Dec. 1974 Interim Study). This coal is not the state's to regulate, and assertion of such authority diminishes the Tribe's own power to regulate. Such state action conflicts with the 1938 Act's purpose of allowing tribes to control the development of their mineral resources.

Montana asserts other legitimate interests, however, that if substantiated at trial may ultimately affect the outcome of the litigation. It argues that western states are burdened with the phenomenon of the "energy boomtown." Large-scale mining operations in rural areas place great strains on state and local governments to provide roads, schools, utilities, fire and police protection, recreation and health facilities, and other more subtle benefits such as a trained work force and an organized government and system of laws. Coal may be mined on the reservation or ceded strip, but the coal miner will undoubtedly be using state services and burdening state government. In addition, mining on the reservation or ceded strip could cause significant environmental effects elsewhere, such as ground and surface water pollution, air pollution, and solid waste disposal problems. The state may encounter substantial costs in dealing with these effects.

On balance, we suspect that these legitimate interests will not be shown to be enough to save the severance tax from fatal conflict with the purposes behind the 1938 Act. A tax carefully tailored to effectuate the state's legitimate interests might survive. *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 163, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980).

 One further complexity deserves mention. Westmoreland is mining coal on the ceded strip. As discussed at p. 1107 *supra*, the ceded strip has been severed from the reservation proper.[16] That being the case, the balance of responsibilities between state and tribal governments may be altered to some degree. The Supreme Court has recognized that the policy of protecting Indian sovereignty involves a "significant geographical component ... which remains highly relevant to the preemption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 148, 100 S.Ct. 2578, 2586.

Although the non-Indian land status of the surface of the ceded strip might make a difference if the state were attempting to raise revenue to implement its legitimate regulatory responsibilities on the surface, the state has not designed its tax to meet those needs. Instead, it appears to have

---

15. See discussion at pp. 1108–1109 *supra*.

16. Regardless of the reservation status of the surface of the ceded area, we think it clear that the Mineral Leasing Act of 1938 is applicable to the leasing of the underlying coal. See discussion at p. 1107 *supra*.

attempted to appropriate a portion of the value of tribal resources that has no relationship to the services, if any, it provides.[17] Inquiry in this regard can be had on remand.

■ As for the Gross Proceeds from Coal Tax, the record is insufficient at this stage of the proceedings to reveal what state, tribal, and federal interests may be involved, or to indicate whether the tax's impact is sufficient to thwart the policies of the 1938 Act. We find that the Tribe has made allegations sufficient to raise the possibility that the tax may conflict with the 1938 Act.

## VI

■ The Tribe argues that Montana's taxes impermissibly infringe on the Tribe's ability to govern itself, and that the taxes therefore violate the principle articulated in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), that, "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 220, 79 S.Ct. at 271. In *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the Supreme Court construed the *Williams v. Lee* test:

[C]ases applying the *Williams* test have dealt principally with situations involving non-Indians.... In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected.

411 U.S. at 179, 93 S.Ct. at 1266. We read *McClanahan* to require the reviewing court to balance the importance of the state interest in asserting the particular authority against the impact on the Tribe's ability to govern itself effectively. *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253, 1257–58 (9th Cir. 1976).

■ The Tribe makes two arguments with respect to the self-government test. First, it argues that the state tax infringes on the Tribe's ability to levy its own severance tax.[18] Second, the Tribe contends that the state tax deprives it of the ability to negotiate with its lessees for higher royalties and thereby restricts its ability to generate revenues needed for tribal programs.

■ With respect to the tribal tax argument, we think that even if the state and tribal taxes were imposed on the same activity,[19] that fact alone would not preclude the state from imposing its tax. Each taxing body is free to impose its tax, since neither tax by its terms precludes the other.

17. We note that Congress has directed the Secretary of Interior to submit proposed legislation allowing tribes to assume regulatory authority under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 (Supp. I 1977), over surface mining on "Indian lands." 30 U.S.C. § 1300(a). "Indian lands" are defined as "all lands, including mineral interests, within the exterior boundaries of any Federal Indian reservation ... and all lands including mineral interests held in trust for or supervised by an Indian tribe." 30 U.S.C. § 1291(9).

18. It is now clear that, generally speaking, tribes retain the power to tax transactions that occur on trust lands and that significantly involve a tribe or its members. *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 152, 100 S.Ct. 2069, 2080, 65 L.Ed.2d 10 (1980).

19. The Tribe's initial attempt to tax its lessees' coal production was partially frustrated by the Secretary of the Interior's refusal to sanction the Tribe's tax ordinances insofar as they applied to coal production on the ceded strip. The Secretary's refusal was based on the Tribe's constitution, which disclaimed authority over lands outside the reservation boundaries. The Tribe has since amended its constitution to allow it to tax mining activity on the ceded strip, and the tribal tax is once again being considered by the Secretary. The Secretary approved the tribal tax ordinance as it applied to the reservation proper.

Although it is true that, as far as Westmoreland's activities on the ceded strip are concerned, Montana's taxes and the tribal taxes do not presently conflict, the issue is nevertheless before us because the tribe has sought declaratory relief with regard to future mining operations on the reservation proper.

*Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 159, 100 S.Ct. 2069, 2084, 65 L.Ed.2d 10 (1980). As a practical matter, however, it is true that Montana's tax may force the Tribe to choose between imposing its tax, thereby discouraging coal mining, or foregoing tax revenues.

■ In our view, the Tribe's impairment-of-tribal-tax argument raises the same concerns as the more generalized argument that the tax infringes on self-government by preventing the Tribe from negotiating for higher royalties. Tribal economic enterprise is unique in that a tribe often engages in economic activity while simultaneously exercising more traditional governmental functions, such as taxation, with respect to the same activity. As a result, a tribe may obtain revenues either by manipulating the price of the goods it sells or by taxing its trading partners, where the tribe has taxing power. Which method a tribe chooses should be a matter of economic indifference to the parties, at least at the outset of the transaction.[20] The effect on tribal self-government is the same whether the state tax is seen as impairing the Tribe's ability to negotiate for higher royalties or as leaving no excess value for the Tribe to tax. Therefore, we give no special force to the Tribe's impairment-of-tribal-tax argument and view the central problem as that of the state's depriving the Tribe of potential revenues.

The Tribe has alleged that the imposition, assessment, and collection of Montana's taxes "severely impaired the ability of the sovereign Crow Tribe to serve its people through its various programs and governmental services, including but not limited to its vitally important land repurchase program, its tribal cultural and historical program, its tribal educational program and its reservation maintenance services." For the purpose of considering a motion for dismissal, we accept as true the allegation that the economic impact of Montana's taxes on tribal government is severe.

■ Tribal economic activity, while perhaps providing the wherewithal for tribal governments to sustain themselves, is at best indirectly linked to the effectiveness of tribal government. It is clear that a state tax is not invalid merely because it erodes a tribe's revenues, even when the tax substantially impairs the tribal government's ability to sustain itself and its programs. *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 152–156, 100 S.Ct. 2069, 2080–2083, 65 L.Ed.2d 10 (1980).

In *Washington v. Confederated Tribes of Colville*, 447 U.S. at 156, 100 S.Ct. at 2083, however, the Supreme Court impliedly recognized that a state's power to tax may be limited when such taxes adversely affect tribal revenues arising from certain goods and services. The Court, in the course of holding that the state could tax on-reservation sales of cigarettes by Indians to non-Indians, noted that "the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest," 447 U.S. at 152, 100 S.Ct. at 2083. The Court further stated:

The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other. While the Tribes do have an interest in raising revenues for essential governmental programs, *that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.* The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services.

---

**20.** The form in which the Tribe gets paid for the resource could be very significant if its taxing power is not limited by contract. If the Tribe is not bound, it would be able to adjust its tax rate to changing economic conditions.

In theory, this would allow it always to extract the maximum economic rent from the good or service without the necessity of renegotiating its royalty agreements.

447 U.S. at 156–157, 100 S.Ct. at 2083 (citation omitted) (emphasis supplied).

In this case, the revenues sought to be taxed by Montana may ultimately be traced to the Tribe's mineral resources, a component of the reservation land itself. This is a not a case where the tribe is simply marketing a tax exemption, as where tribes seek to sell tax-free cigarettes to non-Indians. Any substantial incursion into the revenues obtained from the sale of the Indians' land-based wealth cuts to the heart of the Tribe's ability to sustain itself.

As we have discussed, the Montana legislature has made clear its intention to appropriate a large portion of the surplus economic value of this coal. A major purpose of the tax is to establish a fund that would keep the value of the coal for future generations of Montanans. To the extent that this tax is not related to the actual governmental costs associated with the mining of the Indian coal, *see Washington v. Confederated Tribes of Colville*, 447 U.S. at 163, 100 S.Ct. at 2086, the state's interest in acquiring revenues is weak in comparison with the Tribe's right to the bounty from its own land.

We find that the Tribe's complaint adequately states a claim that the Montana taxes infringe on its right to govern itself. To support the claim at trial, the Tribe must show that the taxes substantially affect its ability to offer governmental services or its ability to regulate the development of tribal resources, and that the balance of state and tribal interests renders the state's assertion of taxing authority unreasonable.

Reversed and remanded for proceedings consistent with this opinion.