ANTHONY S. EARL Governor
You have asked a series of questions relating to possible future mining operations on the reservation of the Mole Lake (Sokaogon) Chippewa Community. Specifically, you ask whether the Wisconsin net proceeds occupation tax, mining permit process and pollution control laws would apply to mining activities by the Sokaogon Tribe, and whether leasing the mining operation to a non-Indian would affect the applicability of these laws. In addition, you wish to know whether an environmental impact statement, if required by the federal government, legally needs to be shared with or presented to the state.
For the reasons explained below, it is my opinion that neither the net proceeds occupation tax nor the mining permit process is applicable to mining operations on the Sokaogon Reservation, whether the mining is conducted by the Tribe or by a non-Indian lessee. In order to answer comprehensively your question concerning the application of state pollution control laws, this opinion would need to analyze in the context of Indian law each state environmental statute and its federal counterpart. An analysis of that depth is beyond the scope of this opinion. Consequently, the section addressing pollution control laws will discuss certain general principles and guidelines, but will not attempt a definitive answer to your question. Finally, it is my opinion that where a federal environmental impact statement must be prepared, the state is entitled to a voice in the process under federal regulations.
The following discussion will first describe the analytical framework used to determine issues of state regulatory authority on Indian reservations. Each of the three regulatory issues — the net *Page 221 
proceeds occupation tax, the mining permit process and state pollution control laws — will then be discussed in turn, as each applies both to a tribal mining operation and to mining conducted by a non-Indian lessee. Finally, your question concerning environmental impact statements will be addressed.
I.
 ANALYTICAL FRAMEWORK FOR STATE JURISDICTION
The enactment of Pub.L. No. 280, 67 Stat. 588 (1953), conferred on Wisconsin criminal and civil jurisdiction over all Indian reservations within the state other than the Menominee Reservation. 18 U.S.C. § 1162; 28 U.S.C. § 1360. The grant of civil jurisdiction has been interpreted by the United States Supreme Court to refer to state court jurisdiction over private civil matters arising on Indian reservations to which Indians are parties. Pub.L. No. 280 did not, the Court held, confer on the state any regulatory jurisdiction, including the power to tax.Bryan v. Itasca County, 426 U.S. 373, 388-90 (1976).
The state is not absolutely prohibited, however, from exercising jurisdiction over Indian tribes and tribe members.White Mountain Apache tribe v. Bracker, 448 U.S. 136, 141 (1980);County of Vilas v. Chapman, 122 Wis.2d 211, 214, 361 N.W.2d 699
(1985); State v. Webster, 114 Wis.2d 418, 432, 338 N.W.2d 474
(1983). State regulatory jurisdiction within reservation boundaries is determined according to established principles most recently articulated by the United States Supreme Court in Ricev. Rehner, 463 U.S. 713 (1983). There exist "two independent but related barriers" to state jurisdiction: federal preemption of state authority and infringement of the tribal right to self-government.Rice, 463 U.S. at 718-19 (citing Bracker,448 U.S. at 142); Chapman, 122 Wis.2d at 214; Webster, 114 Wis.2d at 432. The trend in recent cases has shifted the emphasis away from the second barrier of tribal sovereignty and toward reliance on federal preemption. Rice, 463 U.S. at 718; Chapman,122 Wis.2d at 214; Webster, 114 Wis.2d at 433.
The test for federal preemption is two-pronged. Initially, the courts must assess the "backdrop" of tribal sovereignty by determining whether the tribe has a tradition of self-government in the area sought to be regulated and by balancing the state, federal and tribal interests involved. Against this backdrop, the courts then determine whether the federal government has preempted the *Page 222 
state's exercise of jurisdiction. Rice, 463 U.S. at 719-20;Webster, 114 Wis.2d at 434-36. A finding of preemption in Indian law, however, does not necessarily require that Congress explicitly preempt the assertion of state authority. Rice,463 U.S. at 719; New Mexico v. Mescalero Apache Tribe, 462 U.S. 324,334 (1983).
Judicial analysis of regulatory issues has recently favored the doctrine of federal preemption. Where preemption is not found, however, the courts will address the second and independent barrier of state infringement on the tribal right of self-government. "Although self-government is related to federal preemption in the sense that both depend on congressional action and in the sense that preemption is considered in the context of the deeply ingrained traditional notions of self-government, the self-government doctrine is an independent barrier to state regulation." Crow Tribe of Indians v. Montana, 650 F.2d 1104,1110 (9th Cir. 1981), cert. denied, 459 U.S. 916 (1982). See alsoBracker, 448 U.S. at 143.
Each of your first three questions, regarding the applicability of the state net proceeds occupation tax, mining permit process and pollution control laws to reservation mining activities, whether operated by the tribe or leased to non-Indians, raises an issue of state regulatory authority within reservation boundaries. Consequently, each is analyzed below using this general preemption/infringement framework.
II.
 NET PROCEEDS OCCUPATION TAX
The Wisconsin net proceeds occupation tax, section 70.37 etseq., Stats., is designed to compensate the state and its municipalities for the loss of irreplaceable metalliferous minerals and for the costs associated with that loss. Sec. 70.37
(2), Stats. The tax is imposed on all "persons engaged in the activity of mining metalliferous minerals in this state." Id. A "person" is defined as "a sole proprietorship, partnership, association or corporation and includes a lessee engaged in mining metalliferous minerals." Sec. 70.375 (1)(d), Stats. Under this taxing scheme, if the Sokaogon Tribe or a tribal enterprise were to conduct mining operations on the reservation, the legal incidence of the net proceeds occupation tax would clearly fall on the tribe. *Page 223 
 A. Sokaogon Tribe
A basic tenet of preemption in federal Indian law is that "Indian tribes and individuals generally are exempt from state taxation within their own territory." Montana v. Blackfeet Tribeof Indians, 105 S.Ct. 2399, 2402 (1985). Application of the doctrine has been uniform: states may not, for example, tax Indian income derived solely from reservation sources (McClanahanv. Arizona State Tax Com. 411 U.S. 164 (1973)); personal property of an Indian which is located on trust lands within the reservation (Bryan v. Itasca County, 426 U.S. 373 (1976)); or on-reservation sale of cigarettes to Indians by Indian retailers (Moe v. Confederated Salish Kootenai Tribes, 425 U.S. 463
(1976); Washington v. Confederated Tribes of the Colville IndianReservation, 447 U.S. 134 (1980)).
This line of tax cases establishes a tradition of tribal immunity from state taxation, which may be overcome only "where Congress has expressly provided that state laws shall apply."McClanahan, 411 U.S. at 171 (quoted in Rice, 463 U.S. at 719-20). The United States Supreme Court has recently reiterated this application of Indian law preemption:
 In keeping with its plenary authority over Indian affairs, Congress can authorize the imposition of state taxes on Indian tribes and individual Indians. It has not done so often, and the Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear.
Blackfeet Tribe, 105 S.Ct. at 2403. The question here, then, is whether Congress has clearly authorized the State of Wisconsin to impose its net proceeds occupation tax on Indian mining activities within reservation boundaries.
As noted earlier in this opinion, Wisconsin was granted criminal and civil jurisdiction within the Sokaogon Reservation pursuant to Pub.L. No. 280. The United States Supreme Court has expressly held, however, that Pub.L. No. 280 did not confer on the states the power to tax reservation Indians. Bryan,426 U.S. at 378-79, 390. Nor am I aware of any other congressional enactment which would confer on the state taxing authority over Indian mining activities on the reservation. Consequently, in the absence of congressional intent to permit state taxation, it is my opinion that the Wisconsin net *Page 224 
proceeds occupation tax does not apply to on-reservation mining operated by the Sokaogon Tribe or a tribal enterprise.
B. Non-Indian Lessee
You also ask whether the net proceeds occupation tax would apply if the mining operation were leased to a non-Indian. If the non-Indian lessee were permitted to pass the net proceeds occupation tax along to the tribe, then the legal incidence of the tax would fall on the tribe and the tax would not be applicable for the reasons stated above. See Montana v. BlackfeetTribe of Indians, 105 S.Ct. 2399 (1985), and the district court's explanation of the tax there involved, Blackfeet Tribe of Indiansv. Montana, 507 F. Supp. 446, 448 (D. Mont. 1981). Unlike the Montana net proceeds tax held inapplicable to Indian mining inBlackfeet Tribe, however, the Wisconsin scheme may tax directly "a lessee engaged in mining metalliferous minerals," with no provision permitting the lessee to pass the tax along to the owner of the minerals. Sec. 70.375 (1)(d), Stats.
The fact that the legal incidence of the Wisconsin tax falls on the non-Indian lessee, however, does not necessarily mean that the tax may be imposed. The United States Supreme Court has consistently found that where a comprehensive federal regulatory scheme is present and the actual economic burden of the tax would ultimately fall on the tribe, the legal incidence test is not controlling. Ramah Navajo School Bd. v. Bureau of Revenue ofN.M., 458 U.S. 832, 844 n. 8 (1982); see also White MountainApache Tribe v. Bracker, 448 U.S. 136 (1980); Central MachineryCo. v. Arizona State Tax Com., 448 U.S. 160 (1980); WarrenTrading Post Co. v. Arizona Tax Com., 380 U.S. 685 (1965). On the other hand, where the preemptive effect of pervasive federal regulation is not present, the Court has upheld state taxes which burden non-Indians. Moe v. Confederated Salish Kootenai Tribes,425 U.S. 463 (1976); Washington v. Confederated Tribes of theColville Indian Reservation, 447 U.S. 134 (1980).
Under this preemption analysis, the Court has invalidated a number of state taxes imposed on non-Indians engaged in business on Indian reservations. The Court has struck down both a state sales tax and a state "transaction privilege tax" on the privilege of doing business in the state, imposed on non-Indian sellers for sales to Indians on the reservation. Warren TradingPost, 380 U.S. 685; Central Machinery, 448 U.S. 160. In each case, the Court held that *Page 225 
the federal Indian trader statutes preempted the state tax. "[B]y enacting these statutes Congress `has undertaken to regulate reservation trading in such a comprehensive way that there is no room for the states to legislate on the subject.'" CentralMachinery, 448 U.S. at 166 (quoting Warren Trading Post,380 U.S. at 691 n. 18). Similarly, the Court invalidated state motor carrier license and use fuel taxes applied to a non-Indian company engaged in logging over tribal and Bureau of Indian Affairs roads within the reservation. Bracker, 448 U.S. 136. The Court held that the federal government had so comprehensively regulated the harvesting of Indian timber as to preclude the state taxes, noting that the state performed no governmental services in return for the taxes it sought to assess.[1] Id. at 148, 150. More recently, the Court struck down a state gross receipts tax on a non-Indian company constructing a school for Indian children on the reservation. Ramah Navajo School Bd.,458 U.S. 832. The Court determined that federal regulation of the financing and construction of Indian schools was pervasive and comprehensive, "leav[ing] no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts." Id. at 841-42. As in Bracker, the Court noted that the state did not seek to assess the tax in return for governmental services provided to the non-Indian contractor, nor did the state assert "any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax."Id. at 843.
The applicability of the Wisconsin net proceeds occupation tax to non-Indian lessees must be judged against the standards articulated in this line of cases — specifically, the existence of a comprehensive federal regulatory scheme, and the balance of federal, state and tribal interests involved. The first question, then, is whether there is a comprehensive federal scheme regulating non-Indian mining within reservation boundaries.
The Indian Mineral Leasing Act of 1938,[2] 52 Stat. 377,25 U.S.C. § 396a et seq., governs the leasing of unallotted reservation *Page 226 
lands for mining purposes.[3] The Act provides that an Indian tribe may, with the approval of the Secretary of the Interior, lease its lands for mining operations.[4] 25 U.S.C. § 396a;see also 25 C.F.R. § 211.2. Various sections of the Act address the duration of leases (section 396a), the type of bond to be furnished by the lessee (section 396c), and the officials authorized to approve leases (section 396e). Pursuant to authority granted by section 396d, the secretary promulgated the rules found at 25 C.F.R. pt. 211, described by the Ninth Circuit as follows:
 The regulations promulgated by the Secretary under authority of the 1938 Act cover many aspects of mineral leasing between tribes and non-Indian lessees, including the procedures for acquiring mineral leases, minimum rates for rentals and royalties and the manner in which payments are to be made, penalties for failure to comply with the terms of leases, information to be supplied by lessees, acreage limitations, inspections of lessees' records by Indian lessors or by Department of Interior officials, and cancellation of leases.
Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1112 n. 9 (9th Cir. 1981), as amended, 665 F.2d 1390 (9th Cir. 1982), cert.denied, 459 U.S. 916 (1982).
It appears from these descriptions of the statutes and regulations that the federal scheme governing non-Indian leasing of tribal lands for mining purposes is as pervasive and comprehensive as the federal regulation of Indian traders (Central Machinery), harvesting of Indian timber (Bracker) and school construction (Ramah Navajo *Page 227 School Bd.).[5] Once such a comprehensive federal regulatory scheme has been identified, the federal, state and tribal interests involved must be identified and balanced.
The federal interests involved derive both from general federal Indian policy and from the specific policy goals of the 1938 Indian Mineral Leasing Act. On the more general level, "[i]n a variety of ways, the assessment of state taxes would obstruct federal policies." Bracker, 448 U.S. at 148. Foremost among these is "a firm federal policy of promoting tribal self-sufficiency and economic development. Ambiguities in federal law have been construed generously in order to comport with . . . the federal policy of encouraging tribal independence." Id. at 143-44. More specifically, the 1938 Act was designed to achieve three goals: uniformity of laws governing Indian mineral leases, revitalization of tribal governments and encouragement of tribal economic development. Crow Tribe, 650 F.2d at 1112-13, citing generally H.R. Rep. No. 1872, 75th Cong., 3d Sess. (1938), and S. Rep. No. 985, 75th Cong., 1st Sess. (1937). A tax which would keep from the tribe the economic benefits of its minerals would conflict with these purposes of the Act. Crow Tribe,650 F.2d at 1113.
The Wisconsin net proceeds occupation tax may, in particular, reduce the royalties or other compensation a lessee is willing or able to offer the tribe. Id. at n. 13. Moreover, the tax may "undermine the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates" with respect to mineral leasing. Bracker,448 U.S. at 149; see 25 C.F.R. § 211.15. "The assessment of state taxes would throw additional factors into the federal calculus, reducing tribal revenues and diminishing the profitability of the enterprise for potential contractors." Bracker, 448 U.S. at 149. Finally, the burden of the net proceeds occupation tax, though imposed indirectly through the non-Indian lessee, may "necessarily impede" the strong federal interest in promoting tribal economic development by depleting *Page 228 
available funds. Ramah Navajo School Bd., 458 U.S. at 842, 844
n. 8.
The next factor in the preemption analysis is the state's interest in the tax: whether the state seeks to assess the tax in return for governmental functions it provides, or whether it asserts any specific, legitimate regulatory interest to justify the imposition of the tax. Bracker, 448 U.S. at 150; Ramah NavajoSchool Bd., 458 U.S. at 843-44. Neither services provided by the state to the non-Indian lessee off the reservation nor a generalized interest in raising revenue is sufficient to justify a state tax where the federal government has comprehensively regulated the area. Ramah Navajo School Bd., 458 U.S. at 843-44;Bracker, 448 U.S. at 150.
The governmental functions to be supplied by the state to those upon whom the net proceeds occupation tax is levied are identified in the statutes as "highways, sewers, schools and other improvements which are necessary to accommodate the development of a metalliferous mining industry." Sec. 70.37
(1)(d), Stats. The state's asserted regulatory interests are also identified; they include controlling environmental damage, counteracting potential adverse impacts on the quality of life in communities directly affected by mining, and taxing the privileges enjoyed by those mining in the state. Secs. 70.37
(1)(e)-(h), Stats. The Wisconsin Legislature expressly declared its intent that the tax was "established in order that the state may derive a benefit from the extraction of irreplaceable metalliferous minerals and in order to compensate the state and municipalities for costs, past, present and future, incurred or to be incurred as a result of the loss of valuable irreplaceable metallic mineral resources." Sec. 70.37 (2), Stats. To this end, forty percent of the tax collected is transferred to the general fund, while sixty percent of the net proceeds occupation tax is deposited in a local "impact fund" for the use of municipalities in meeting both "long and short-term costs associated with social, educational, environmental and economic impacts of metalliferous mineral mining." Secs. 70.395 and 70.37 (1)(i), Stats. Payments from the local impact fund are made yearly in an amount equal to $100,000 to each city, town or village and to each county in which metalliferous minerals are extracted; each such county also receives twenty percent of the net proceeds occupation tax collected in that county, or $250,000 whichever is less. Sec. 70.395 (2)(d), Stats. These annual disbursements from the fund include an amount equal to $100,000 to "any *Page 229 
Native American community that has tribal lands within a municipality qualified to receive a payment" from the impact fund. Sec. 70.395 (2)(d)(2m), Stats. In its entirety, the Wisconsin taxing scheme "demonstrates a purpose to keep the value represented by the state's nonrenewable assets intact, for use by [the state's residents] in the future." Crow Tribe,650 F.2d at 1114.
These asserted state interests must be balanced against the interests of the federal and tribal governments. The basic problem inherent in the state's interest in a mining tax has been identified by the Ninth Circuit: "While the state may have an interest in perpetuating the value of mineral wealth subject to its general civil jurisdiction, it has no such legitimate interest in appropriating Indian mineral wealth." Crow Tribe,650 F.2d at 1114. Put simply, subsurface minerals on the reservation are "not the state's to regulate." Id. Unlike metalliferous minerals located elsewhere in the state, reservation minerals do not belong in any sense to the state. The subsurface minerals, rather, like the land under which they lie, are held by the federal government in trust for the tribe. See, e.g., QuantumExploration, Inc. v. Clark, 780 F.2d 1457, 1461 (9th Cir. 1986).
Like the State of Montana in Crow Tribe, 650 F.2d at 1114, Wisconsin does assert other legitimate interests in imposing its net proceeds occupation tax, including governmental services provided and costs incurred by the state and municipalities, and the adverse effect of mining on the area's environment and quality of life. However, while some of the governmental functions identified in the Wisconsin statutes will be performed by the state even for an on-reservation mining operation, many more will not. A number of the governmental services necessary to a mining operation within reservation boundaries likely will be provided by the Sokaogon Tribe. Off-reservation services performed by the state for the non-Indian lessee would not justify the tax in question since presumably state tax revenues from the lessee's business activities outside the reservation are adequate to reimburse the state for those services. Ramah NavajoSchool Bd., 458 U.S. at 843-44 and n. 9. Moreover, the net proceeds occupation tax is intended to compensate the state and its municipalities for costs incurred as a result of mining operations, but many of the costs from on-reservation mining will be borne by the tribe. Similarly, the tribe rather than the state will absorb the bulk of the detrimental effects of mining on the local environment and quality of life. *Page 230 
In Crow Tribe, the Ninth Circuit balanced the similar interests of the State of Montana against those of the federal and tribal governments, and concluded: "On balance, we suspect that these legitimate interests will not be shown [at trial] to be enough to save the severance tax from fatal conflict with the purposes behind the 1938 [Indian Mineral Leasing] Act." 650 F.2d at 1114. The court went on to note, however, that "[a] tax carefully tailored to effectuate the state's legitimate interests might survive." Id. As with the Montana lax, a "major purpose" of the Wisconsin net proceeds occupation tax is "to establish a fund that would keep the value of the [minerals] for future generations of [Wisconsin residents]. To the extent that this tax is not related to the actual governmental costs associated with the mining of the Indian [minerals], . . . the state's interest in acquiring revenues is weak in comparison with the tribe's right to the bounty from its own land." Id. at 1117 (citation omitted).
An Indian tribe's interest in taxing "is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." Colville, 447 U.S. at 156-57. The state's interest in taxation "is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." Id. at 157. In the case of applying the net proceeds occupation tax to mining activities conducted on the reservation by a non-Indian lessee, the value to be taxed will be generated on the reservation, the activity will involve the tribe and the taxpayer, although receiving some state services, will also be the recipient of tribal services.
Considering all these factors, along with the comprehensive federal regulation of Indian mining leases and the burdens on federal policy, it appears that the balance must tip in favor of federal preemption of the Wisconsin tax. Consequently, it is my opinion that in this case "the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed" by the Wisconsin tax. Bracker, 448 U.S. at 148. The Wisconsin net proceeds occupation tax may not, therefore, be applied to non-Indian lessees of mining operations on the Sokaogon Reservation. *Page 231 III.
 MINING PERMIT PROCESS
Wisconsin law provides that "[n]o operator may engage in mining or reclamation at any mining site that is not covered by a mining permit and by written authorization to mine under s. 144.86 (3)."[6] Sec. 144.85 (1)(a), Stats. An operator is defined as "any person who is engaged in, or who has applied for or holds a permit to engage in, prospecting or mining, whether individually, jointly or through subsidiaries, agents, employes or contractors." Sec. 144.81 (9), Stats. An application for a mining permit must include, among other items, a mining plan, including a description and detailed map of the proposed site; a detailed reclamation plan showing the manner, location and time of reclamation; satisfactory evidence of application for all necessary approvals under local zoning ordinances and for all necessary licenses and permits issued by the Department of Natural Resources (DNR); and an itemized estimation of the cost to the state of reclamation. Secs. 144.85 (3) (4), Stats. In addition, the applicant must pay DNR's actual cost of evaluating the mining permit application. Sec. 144.85 (2), Stats. Following a public hearing, DNR shall issue a mining permit if it finds that the application meets certain conditions set out in the statutes. Sec. 144.85 (5), Stats.
A. Sokaogon Tribe
Your first question concerning the mining permit process is whether the Sokaogon Tribe would be required to obtain a permit in the event that it conducted mining activities on the reservation. The application of the mining permit process to a tribal mining operation "involves an attempt to regulate Indian use of Indian trust lands." Santa Rosa Band of Indians v. KingsCounty, 532 F.2d 655, 658 (9th Cir. 1975), cert. denied, 429 U.S. 1038
(1977). Indian tribes are "distinct, independent political communities," possessing inherent sovereign powers to regulate "their internal and social relations," and to make "their own substantive law in internal matters."Santa Clara Pueblo v.Martinez, 436 U.S. 49, 55-56 (1978). As such, Indian tribes exercise "attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557
(1975). This "significant territorial component *Page 232 
to tribal power," Merrion v. Jicarilla Apache Tribe,455 U.S. 130, 142 (1982), forms part of the "backdrop" of Indian sovereignty against which the courts determine whether the federal government has preempted state jurisdiction.
The second component of the "backdrop" is the balance of federal, state and tribal interests. In a situation such as tribal mining of minerals located under trust lands, the balance will usually tip in favor of the tribal and federal interests. "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the state's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." Bracker,448 U.S. at 144; see also 72 Op. Att'y Gen. 54, 56 (1983).
The federal-tribal interests at stake here are particularly compelling. The established federal policy of promoting tribal self-government encompasses the "overriding goal of encouraging tribal self-sufficiency and economic development." New Mexico v.Mescalero Apache Tribe, 462 U.S. 324, 335 (1983) (quotingBracker, 448 U.S. at 143). The Court has held that Indian tribes, "[i]n part as a necessary implication" of this federal policy, have the authority to manage and control the use of their territory and their resources. Id. More specifically, Congress has recognized mineral development of Indian lands as an appropriate tool for economic development and governmental revitalization. See Crow Tribe, 650 F.2d at 1112 (discussing the goals of the Indian Mineral Leasing Act).
A tribal mining operation doubtlessly would be undertaken to develop and manage the reservation's resources for the benefit of the tribe's members, generating revenues for essential tribal governmental services and providing employment for tribe members resident on the reservation. See Mescalero Apache Tribe,462 U.S. at 341. Under these circumstances, state imposition of a regulatory scheme would serve as an obstacle to the full accomplishment of the federal goals for tribal self-determination and economic revitalization. Id.
The state's interests in regulating tribal mining operations must be "justified by functions or services performed by the state in connection with the on-reservation activity." Id. at 336. The state's interests in imposition of its mining permit process, as reflected in the statutory criteria for permit approval, appear to be reclamation, *Page 233 
compliance with applicable state environmental laws, suitability of the site for mining, public health and safety, economic impact, and compliance with zoning ordinances. Sec. 144.85 (5)(a)(1), Stats. While these are clearly legitimate state regulatory interests in mining activity elsewhere in the state, with respect to Indian mineral wealth, "[t]his coal is not the state's to regulate, and assertion of such authority diminishes the Tribe's own power to regulate." Crow Tribe, 650 F.2d at 1114. Imposition of the state mining permit process could allow the state to dictate whether, when and how the tribe could choose to develop and manage the reservation's resources for the benefit of the tribe members. Regulation by the state, through the mining permit process, could infringe substantially on Indian resource development, interfering with the federal policy of promoting tribal governmental and economic independence.
Because of the potential for significant infringement on tribal activity within reservation boundaries represented by the mining permit process, the state's interest in regulating and controlling Indian mineral development is not sufficient to overcome the tribal and federal interests involved. The balance of interests concerning the state's authority to impose the mining permit process on tribal mining operations must tip in favor of the tribe and the federal government.
Under these conditions — retained tribal sovereignty over reservation lands, subordinate state regulatory interests, and strong federal and tribal interests — state laws are generally not applicable to Indian activities on the reservation except where Congress has expressly provided that they shall apply. McClanahan, 411 U.S. at 170-71; 72 Op. Att'y Gen. at 56. As noted previously in this opinion, Pub.L. No. 280, which conferred upon the state jurisdiction over private civil actions, was not a grant of regulatory authority. Bryan, 426 U.S. at 378-79,390. Nor am I aware of any federal enactment that does grant to the state such authority, either generally to regulate Indian activities within reservation boundaries or specifically to require mining permits of tribal mining operations. Without any clear congressional authorization, and in the absence of exceptional circumstances, it is my opinion that the mining permit process is not applicable to tribal mining operations on trust lands within reservation boundaries. *Page 234 
 B. Non-Indian Lessee
Your next question is whether the mining permit process would be applicable to non-Indian lessees of mining operations on the reservation. In such cases, where the state asserts authority over the conduct of non-Indians engaged in on-reservation activity, federal enactments are examined "in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence." Bracker, 448 U.S. at 144-45.
One such federal enactment is the grant of civil jurisdiction to Wisconsin contained in Pub, L. No. 280, codified at 28 U.S.C. § 1360. Subsection (b), which concerns in part real property belonging to an Indian tribe and held in trust by the United States, provides in pertinent part that: "Nothing in this section . . . shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto." 28 U.S.C. § 1360 (b). The Secretary of the Interior has promulgated regulations which prevent the application of most state laws to the use and development of leased trust property, except where the Secretary has adopted such laws or made them applicable in specific cases or specific geographic areas.25 C.F.R. § 1.4 (1985). See Santa Rosa Band, 532 F.2d at 664-65. In relevant part, the federal regulation provides that:
 [N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State . . . limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real . . . property . . . shall be applicable to any such property leased from or held or used under agreement with and belonging to any . . . Indian tribe, band, or community that is held in trust by the United States. . . .
25 C.F.R. § 1.4 (a) (1985). The Wisconsin mining permit process, if applied to non-Indian mineral lessees, clearly would regulate or control the use or development of trust lands leased from the tribe. Since it does not appear that the Secretary of the Interior has ever adopted or made applicable the state mining permit laws, it is my opinion that application of the permit process to a non-Indian lessee of mining operations would conflict with this federal regulation and, consequently, with Pub.L. No. 280. *Page 235 
A second, more specific federal enactment applicable in the mining permit context is the Indian Mineral Leasing Act of 1938, discussed previously in connection with the net proceeds occupation tax. As I concluded in that section, the 1938 Act and its attendant regulations, 25 C.F.R. pt. 211, comprise a comprehensive federal scheme regulating non-Indian leasing of tribal lands for mining purposes. The pervasiveness of the federal scheme is particularly clear in relation to the mining permit process, where the federal requirements correspond closely to state law provisions. Specifically, the 1938 Act requires approval by the Secretary of the Interior of all mining leases entered into with Indian tribes, and addresses the duration of leases and the type of bond to be furnished by the lessee.25 U.S.C. §§ 396a and 396c. The regulations promulgated pursuant to the 1938 Act control such aspects of mineral leasing as procedures for acquiring leases, bonding requirements, penalties for failure to comply with lease terms, acreage limitations and cancellation of leases. See generally 25 C.F.R. pt. 211. Mine operators are required to submit a mining plan for the approval of the United States Geological Survey's Regional Mining Supervisor. 25 C.F.R. § 216.7 (a) (1985). These plans may include descriptions and maps of the site, proposed methods of operating, and proposed manner and time of reclamation.25 C.F.R. § 216.7 (b) (1985). In addition, actual operations may not be started without written permission, and all operations must be conducted in accordance with the operating regulations promulgated by the Secretary of the Interior.25 C.F.R. § 211.20 (b) (1985).
Federal policies underlying the 1938 Act were also noted previously in this opinion. Specifically, the three goals of the Act were uniformity in the laws governing Indian mineral leases, revitalization of tribal governments and encouragement of tribal economic development. Crow Tribe, 650 F.2d at 1112-13, citing generally H.R. Rep. No. 1872, 75th Cong., 3d Sess. (1938), and S. Rep. No. 985, 75th Cong., 1st Sess. (1937). More generally, federal Indian policy in recent decades has been firmly committed to promoting tribal self-government and self-sufficiency.Mescalero Apache Tribe, 462 U.S. at 334-35 n. 17; Bracker,448 U.S. at 143-44.
Viewed in light of these federal policies, the potential for conflict between the state and federal regulatory schemes is manifest. For example, the Secretary of the Interior could approve a lease, but the state could deny a mining permit, thereby blocking the federal *Page 236 
intent to permit that mining operation. Similarly, the state could cancel or revoke its mining permit, with the result that the non-Indian lessee would be prevented from mining under a valid, federally-approved lease. Either situation would directly conflict with all three goals of the 1938 Act: either would decrease uniformity in the laws governing Indian mineral leases, subordinate the tribe's lease to state control, thereby weakening the role of the tribal government, and discourage the economic development represented by mining operations on tribal lands. For the same reasons, application of the mining permit process to non-Indian lessees would interfere with federal Indian policy, and directly conflict with federal regulations preventing the application of state law to the development of leased trust property.
Consequently, it is my opinion that these federal enactments, along with their attendant regulations and underlying policies, preempt the application of the state's mining permit process to a non-Indian lessee of tribal mineral lands.
IV.
 POLLUTION CONTROL LAWS
Wisconsin has legislated an extensive regulatory scheme to control environmental pollution within the state. The regulations address water and sewage, air pollution, solid waste, hazardous waste and refuse (ch. 144, Stats.) and water pollution (ch. 147, Stats.). In general, these state regulations are companion laws to federal regulatory statutes, such as the Clean Air Act,42 U.S.C. § 7401 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., which provide mechanisms by which the states may administer their own pollution control programs in lieu of the federal programs.
As evidenced by the regulations in chapters 144 and 147, Wisconsin has implemented its own pollution control programs in a number of areas. The question you raise is whether these state regulations are applicable to mining operations on the Sokaogon Reservation, whether conducted by the tribe or by a non-Indian lessee. For the reasons explained below, I do not believe that a blanket determination of the applicability of state pollution control laws to on-reservation mining can be made. *Page 237 
As already noted, pollution control legislation, on both the state and federal levels, is diverse and complex. In particular, the degree to which these environmental laws address or are expressly applicable to Indian tribes varies from one statute to the next.[7] An adequate and comprehensive response to your question, therefore, would require an analysis of (1) each federal statute, its legislative history and its application within reservation boundaries, (2) the equivalent state law and the extent to which it addresses Indian tribes, and (3) the principles of the preemption and infringement doctrines as applied to each set of paired statutes. A calculus of that depth and length — particular to each environmental statute — is simply beyond the scope of this opinion. Alternatively, a discussion of the applicability of pollution control laws in general would be inadvisable given the diversity and complexity of state and federal statutes.
Consequently, the following sections will provide no definite answer, either as to pollution control laws in general or, with a few exceptions, as to specific environmental statutes. The sections instead will discuss the available published law on the topic, and address general principles and guidelines to be employed in deciding on the applicability of any particular environmental law.
A. Sokaogon Tribe
In previous opinions, I have addressed the applicability of certain state environmental laws to Indian tribes and reservations. OAG 51-78 (unpublished, dated July 31, 1978); 72 OP. Att'y Gen. 54 (1983). In the earlier of these opinions, which addressed the on reservation applicability of the Wisconsin Pollution Discharge Elimination System (WPDES), chapter 147, I concluded that the state was "without authority to issue WPDES permits" to Indian tribes or tribal organizations operating on reservations and Indian lands in Wisconsin. OAG 51-78 at 1, 3. I based my opinion on the fact that the Wisconsin Legislature did not include Indian tribes or organizations within the definition of persons covered by chapter 147, whereas the equivalent Federal Water Pollution Control Act (FWPCA) expressly extended its scope to both tribes and tribal organizations. Id. at 2-3. This failure plainly to include tribes, in my *Page 238 
opinion, represented a deliberate legislative decision. Id. at 2-4. 1 noted also that the federal Environmental Protection Agency currently was issuing permits to tribal dischargers pursuant to federal law, id. at 4, as a means of ensuring that on-reservation dischargers adhered to federal environmental standards.
I am not aware of any factor that would cause me to alter my existing opinion. Neither the federal nor state definition of persons covered has been changed; the federal statute still includes tribes and tribal organizations, while the state law still excludes them. Had the state Legislature wished to amend the state law to expressly cover Indian tribes, it certainly could have done so. Consequently, it remains my opinion that chapter 147 is not applicable to a tribal mining operation on the reservation.
An identical analysis would be applicable to hazardous waste regulations, since the federal Resource Conservation and Recovery Act (RCRA) expressly includes Indian tribes and organizations,42 U.S.C. §§ 6903 (13) and 6903 (15), while the equivalent state Hazardous Waste Management Act does not. Secs. 144.61 (9) and 144.01 (6), Stats. It is not necessary to reach this analysis, however, because an express federal pronouncement preempts Wisconsin's hazardous waste jurisdiction on Indian reservations. In granting Wisconsin final authority to operate its hazardous waste management program in lieu of the federal program, the Environmental Protection Agency (EPA) specifically stated: "Wisconsin is not authorized to operate the RCRA program on Indian lands, and this authority will remain with the U.S. EPA."51 Fed. Reg. 3783, 3784 (1986).[8] The state Hazardous Waste Management Act, sections 144.60 to 144.74, therefore, is not applicable to tribal mining operations on the reservation.
The analysis employed for the water pollution control regulations does not appear to be applicable to other sets of paired state and federal environmental laws, because unlike FWPCA, other federal environmental statutes do not apply expressly to tribes and tribal organizations. Nor do there appear to be specific federal pronouncements concerning state environmental jurisdiction in any area other than hazardous waste management. Where neither the *Page 239 
FWPCA analysis nor a specific federal statement of preemption is applicable, state jurisdiction to impose environmental regulations on tribal activities is determined according to the same principles as jurisdiction to impose the mining permit process. While it is beyond the scope of this opinion specifically to apply those principles to the range of state environmental laws, the following general discussion may prove helpful.
An analysis of the applicability of a particular state environmental regulation to tribal mining operations would begin with the "backdrop" of tribal sovereignty. As noted in the mining permit process discussion, regulations such as pollution control laws and the mining permit process involve the regulation of Indian use of Indian trust lands, a situation in which the territorial component of tribal sovereignty forms a significant element of the "backdrop." of significance also is the tradition of self-government which the Tribe exercises in the area of pollution control. While I am not aware of any tribal environmental protection laws at this time, the existence or development of such regulations, coupled with effective enforcement mechanisms, would weigh heavily against the applicability of state environmental laws.[9] See, e.g.,Webster, 114 Wis.2d at 434-35.
The other component of the "backdrop" of tribal sovereignty is the balance of state, federal and tribal interests. In the area of environmental protection, those interests are particularly strong on all sides.
On one side of the balance of interests are those of the state. As the Ninth Circuit stated in the context of asserted state jurisdiction over hazardous waste: "We recognize the vital interest of the State of Washington in effective hazardous waste management throughout the state, including on Indian lands."State of Wash., Dept. of Ecology v. U.S.E.P.A., 752 F.2d 1465,1472 (9th Cir. 1985). The substantial character of the state's interest stems from the transboundary nature of pollution, and its migratory impact outside the reservation. See, e.g., Comment,Developing Test for State Regulatory Jurisdiction in IndianCountry: Application in the Context of *Page 240 Environment Law, 61 Ore. L. Rev. 561, 564, 582 (1982). The United States Supreme Court has recognized the importance to the state of adverse "spillover" effects of on-reservation conduct or activities. Rice, 463 U.S. at 724. "A state's regulatory interest will be particularly substantial if the state can point to off-reservation effects that necessitate state intervention."Mescalero Apache Tribe, 462 U.S. at 336.
On the other hand, the federal and tribal interests are also compelling. Despite the potential for spillover, a tribal mining operation constitutes "on-reservation conduct involving only Indians," a situation in which "the federal interest in encouraging tribal self-government is at its strongest." Bracker,448 U.S. at 144. In the context of hazardous waste management, the Ninth Circuit posited the interests involved as "the tribal interest in managing the reservation environment and the federal policy of encouraging tribes to assume or at least share in management responsibility." State of Wash., Dept. of Ecology,752 F.2d at 1472. The court noted that "[t]he federal government has a policy of encouraging tribal self-government in environmental matters," a policy reflected both in federal environmental statutes giving tribes "a measure of control over policymaking or program administration or both" and in the policies and practices of the EPA. Id. at 1471 (footnote omitted). See also, Will,Indian Lands Environment — Who Should Protect It?, 18 Natural Res. J. 465, 474-87 (1978). More specifically, the court cites to EPA policy documents which advocate "an enhanced role for tribal government in relevant decision-making and implementation of Federal environmental programs on Indian reservations,"[10] and which charge EPA to "endeavor where appropriate to give tribal governments the primary role in environmental program management and decision-making relative to Indian lands."[11]
The "backdrop" of tribal sovereignty, consisting of the elements discussed above, informs the question whether the federal government has preempted state jurisdiction to impose a given environmental law. Factors which may be significant to the preemption analysis include the EPA policy statements quoted above and the *Page 241 
authority of EPA, under certain federal statutes, to permit tribes the primary responsibility for environmental protection within reservation borders. See Nance v. EPA, 645 F.2d 701, 714
(9th Cir. 1981) (Indian tribes can set on-reservation air quality goals, independent of the states, under the Clean Air Act). Two additional factors, however, may be of more importance to the preemption analysis.
The first of these is that Congress has not expressly authorized the imposition of state pollution control laws within reservation boundaries. The general grant of state civil jurisdiction, Pub.L. No. 280, did not authorize the applicability of state regulations, such as environmental laws, to Indian uses of reservation lands. Bryan, 426 U.S. at 378-79,390; Will, Indian Lands Environment — Who Should ProtectIt?, 18 Natural Res. J. 465, 489 (1978). Neither do the federal environmental statutes confer jurisdiction over reservation lands upon the states. State of Wash., Dept. of Ecology,752 F.2d at 1467-68; see also Will, Indian Lands Environment — WhoShould Protect It?, 18 Natural Res. J. 465, 474-87 (1978).
The second factor of importance is the retained authority of EPA to enforce adherence to federal environmental standards. As a rule, federal environmental statutes are generally applicable within reservation borders. Some of the federal environmental laws, such as RCRA and FWPCA, expressly include Indian tribes.See State of Wash., Dept. of Ecology, 752 F.2d at 1466-67; OAG 51-78 (unpublished, dated July 31, 1978). Other federal laws are applicable under the general rubric that federal statutes of a general nature apply to Indians and Indian tribes as to any other persons. Will, Indian Lands Environment — Who ShouldProtect It?, 18 Natural Res. J. 465, 468 (1978), citing FederalPower Commission v. Tuscarora Indian Nation, 362 U.S. 99 (1960). Consequently, as the Ninth Circuit has noted, an absence of state environmental jurisdiction "does not leave a vacuum in which [pollutants] go unregulated. EPA remains responsible for ensuring that the federal standards are met on the reservations." State ofWash., Dept. of Ecology, 752 F.2d at 1472.
The few authorities which have considered the applicability of particular state environmental laws within reservation borders have concluded that the state, at most, has environmental jurisdiction only in limited circumstances. The Ninth Circuit upheld EPA's conclusion that under RCRA, the federal hazardous waste management *Page 242 
statute, states have no jurisdiction over Indian lands. Id. at 1469, 1472. See also 51 Fed. Reg. at 3784. Despite the "vital interest" of the state in hazardous waste management, the court reasoned that "the tribal interest in managing the reservation environment and the federal policy of encouraging tribes to assume or at least share in management responsibility are controlling." Id. at 1472. See also Nance, 645 F.2d at 714 (under the Clean Air Act, tribes possess "the same degree of autonomy to determine the quality of their air as was granted to the states."); Smith and Guenther, Environmental Law: ProtectingClean Air: The Authority of Indian Governments to RegulateReservation Airsheds, 9 Am. Indian L. Rev. 83 (1981).
The Attorney General of Alaska, addressing the question of state jurisdiction to enforce air quality regulations on reservations, concluded that there is no "legally certain" basis for state jurisdiction over pollution sources within the reservation "absent evidence of transboundary pollution." 1983 Op. Att'y Gen. Alaska No. 101. In a recent opinion of this office addressing state authority to monitor groundwater on Indian reservations, I reached a similar conclusion. 72 Op. Att'y Gen. 54 (1983). That opinion, in balancing the interests involved, determined that "the state's interest in conducting this activity does not appear to be sufficient to overcome the general rule that prohibits the exercise of state jurisdiction on Indian lands without specific congressional authorization." Id. at 59. Analogous to the Alaska opinion, I concluded as follows: "Although not settled, it is my opinion that where it can be conclusively shown that without state regulation prospecting or mining activity would contaminate groundwater moving beyond Indian lands thereby posing an immediate danger to public health, safety or the general welfare, such regulation is permissible."Id. at 61.
The trend in reported case law and opinions appears to deny general state environmental jurisdiction within reservation boundaries, although exceptions may be recognized for on-reservation pollution sources with adverse off-reservation effects. The determination of the applicability of a given state regulation, however, will be determined on a case-by-case basis, employing the framework and general principles outlined above.
B. Non-Indian Lessee *Page 243 
You also ask whether state environmental protection laws are applicable to a non-Indian lessee conducting mining operations on the reservation. AS noted in previous sections, questions of state authority over the on-reservation activities of non-Indians require an examination of the tradition of tribal sovereignty and of the broad policies underlying relevant federal enactments.Bracker, 448 U.S. at 144-45. The determination calls "for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." Id. at 145.
Because the question of state environmental jurisdiction over non-Indians requires an examination of the "specific context," the following discussion, like the preceding section, will not attempt a definitive answer to your inquiry.[12] As with the applicability of state pollution control laws to tribal mining operations, an answer to your question concerning non-Indian lessees particular to each state environmental law is beyond the scope of this opinion, whereas a general answer would be a disservice given the diversity and complexity of state and federal regulation in the area. The following discussion, therefore, will briefly discuss the pertinent federal laws and regulations, and outline the state, federal and tribal interests that may be implicated by the assertion of state environmental authority over Indian mineral leases.
The relevant federal enactments and their underlying policies have to a large extent been described in previous sections of this opinion. One such enactment is the federal regulation which prohibits the state from "limiting, zoning or otherwise governing, regulating, or controlling the use or development" of trust lands leased from an Indian tribe. 25 C.F.R. § 1.4 (a) (1985). It would appear that state pollution control laws, through their permitting requirements, may substantially affect the use or development of property subject to the permits. Consequently, it seems that to the extent state *Page 244 
environmental laws conflict with the provisions of section 1.4, the state regulations would be preempted by federal law.
The other relevant federal enactment is the Indian Mineral Leasing Act of 1938. Previous sections of this opinion have established that the 1938 Act and its attendant regulations generally comprise a comprehensive federal scheme to regulate non-Indian mineral leasing of tribal lands. In the particular context of environmental protection, regulations promulgated by the Secretary of the Interior include 25 C.F.R. pt. 216, which is designed to provide procedures "to avoid, minimize, or correct damage to the environment — land, water, and air — and to avoid, minimize, or correct hazards to the public health and safety" which may arise from mineral development of Indian lands. 25 C.F.R. § 216.1 (1985).[13]
To those ends, the regulations provide that, in connection with every lease application, the appropriate Bureau of Indian Affairs (BIA) officer shall make a "technical examination of the prospective effects of the proposed exploration or surface mining operations upon the environment." 25 C.F.R. § 216.4 (a)(1) (1985).
 The technical examination shall take into consideration the need for the preservation and protection of other resources, including cultural, recreational, scenic, historic, and ecological values; and control of erosion, flooding, and pollution of water; the isolation of toxic materials; the prevention of air pollution; the reclamation by revegetation, replacement of soil or by other means, of lands affected by the exploration or mining operations; the prevention of slides; the protection of fish and wildlife and their habitat; and the prevention of hazards to public health and safety.
Id. Based on this technical examination, the BIA sets "general requirements which the applicant must meet for the protection of nonmineral resources"; these standards are then incorporated in the operator's mining lease. 25 C.F.R. § 216.4 (b) (1985). At any time the BIA may restrict or even prohibit operations if the mining cannot feasibly be conducted without lowering water quality below *Page 245 
certain standards or causing the destruction of other resources.25 C.F.R. § 216.4 (d) (1985). If the operation appears likely to lower water quality, no lease will be issued until compliance with the Federal Water Pollution Control Act is assured. 25 C.F.R. § 216.4
(e) (1985). In addition, operators must submit a mining plan to the United States Geological Survey's Regional Mining Supervisor, who may require the plan to include proposed measures to prevent environmental pollution. 25 C.F.R. § 216.7 (1985). Specific regulations for coal mining, moreover, address such issues as disposal of spoil and waste materials, topsoil handling and protection of the hydrologic system. 25 C.F.R §§ 216.100 to 216.111 (1985).
This federal regulatory scheme must be viewed in light of the goals of the 1938 Act: uniformity in the laws governing Indian mineral leases, revitalization of tribal governments and encouragement of tribal economic development. To the extent that the imposition of state pollution control laws on non-Indian lessees, by requiring lessees to comply with two sets of environmental laws, would decrease uniformity in the laws applicable to mineral leases, weaken the tribal governmental role in development of reservation resources and discourage economic development by placing increased burdens on mineral lessees, the state laws may well be preempted.
In the balance of the state, federal and tribal interests involved, the state's interests are strong where, as here, the on-reservation activities may have off-reservation effects and the activities are conducted by non-Indians. The federal and tribal interests are also strong, however: they include "the tribal interest in managing the reservation environment and the federal policy of encouraging tribes to assume or at least share in management responsibility," State of Wash., Dept. of Ecology,752 F.2d at 1472; the 1938 Indian Mineral Leasing Act goals of uniform laws, stronger tribal governments and increased tribal economic development; and the general federal Indian policy of encouraging tribal self-government and economic self-sufficiency. The authority of the state to impose a particular environmental law or regulation will require balancing these interests against the backdrop of the federal regulatory scheme for controlling environmental damage by non-Indian lessees. See e.g., Comment,The Developing Test for State Regulatory *Page 246 Jurisdiction in Indian Country: Application in the Context ofEnvironmental Law, 61 Ore. L. Rev. 561, 583-84 (1982).
V.
 ENVIRONMENTAL IMPACT STATEMENTS
Your final question concerns any Environmental Impact Statement (EIS) for mining activities on the Sokaogon Reservation, whether conducted by the tribe or by a non-Indian lessee, which may be required under the National Environmental Policy Act (NEPA),42 U.S.C. § 4321 et seq. If a federal EIS is prepared pursuant to NEPA, you ask whether it would legally need to be shared with or presented to the state.
Under a number of federal regulations, the federal agency responsible for preparing an EIS must make the document publicly available. For instance, agencies are charged with ensuring public involvement in the EIS process through various notice procedures, including specific notice to those who have requested it on an individual action. 40 C.F.R. § 1506.6 (1985). Agencies are also required to solicit comments at the draft stage of the EIS process from "appropriate State and local agencies which are authorized to develop and enforce environmental standards," as well as any other agency "which has requested that it receive statements on actions of the kind proposed."40 C.F.R. § 1503.1 (a)(2) (1985). Moreover, the preparing agency is required to circulate both draft and final versions of the EIS, including the entire statement to any agency which has requested it and, for the final EIS, any agency which submitted substantive comments on the draft. 40 C.F.R. § 1502.19 (1985).
Given these strictures, it is virtually certain that a federal agency preparing an EIS in connection with proposed mining operations on the Sokaogon Reservation would present the document, in both draft and final forms, to the state for comment and review. In the unlikely event that the preparing agency did not, the state need merely request the EIS under the regulations outlined above. The state thus can ensure, in either case, that it has input into the EIS process.
BCL:JDN
[1] See also Hoopa Valley Tribe v. Nevins, 590 F. Supp. 198
(N.D. Cal. 1984). Relying on the preemption analysis in Bracker, the California district court invalidated a tax on the value or timber at the time of harvest as levied against non-Indian purchasers of tribal timber. The court held that neither regulatory nor revenue-raising interests of the state permitted the burden which the tax imposed on the federal regulatory scheme.
[2] The 1938 Act repealed all acts or parts of acts "inconsistent herewith." Act of May 11, 1938, sec. 7. The Act of May 29, 1924, 43 Stat. 244, 25 U.S.C. § 398 et seq. amending an 1891 Act, authorized state and local governments to levy and collect taxes on mineral lessees of Indian lands "in the same manner as such taxes are otherwise levied and collected."25 U.S.C. § 398c. The United States Supreme Court recently concluded, however, that neither the text nor the legislative history of the 1938 Act suggests a congressional intention to permit state taxation. Consequently the Court held, "if the tax proviso survives at all, it reaches only those leases executed under the 1891 Act and its 1924 amendment." Blackfeet Tribe,105 S.Ct. at 2404. Any mineral lease issued today would, of course, be under the 1938 Act, and thus not subject to the tax provision of the 1924 Act.
[3] Allotted lands may also be leased for mining purposes pursuant to 25 U.S.C. § 396 and its attendant regulations, 25 C.F.R. pt. 212 (1985). This opinion will not address mining on allotted lands, however, since it is my understanding that there are no allotted lands on the Sokaogon Reservation.
[4] In addition, Congress in 1982 enacted the Indian Mineral Development Act, 96 Stat. 1938, 25 U.S.C. § 2101 et seq. The major purpose of the Act was to expand mineral development options available to tribes beyond the usual lease agreements and into the possibility of joint ventures and other non-lease arrangements. H.R. Rep. No. 746, 97th Cong., 2d Sess. 4, reprinted in 1982 U.S. Code Cong. Ad. News 3465, 3466. Since you have asked only about leasing of the mining operation to non-Indians, a discussion of the 1982 Act is beyond the scope of this opinion.
[5] In a previous opinion of this office, in the specific context of prospecting and mining activity conducted on non-Indian lands within the reservation, I stated that "the federal government has not undertaken comprehensive regulation of mining activities, in general, or groundwater, in particular, within reservation boundaries." 72 Op. Att'y Gen. 54, 60 (1983). Given the sources cited above, that conclusion clearly does not apply to federal regulation of mineral leasing of Indian lands within reservation boundaries.
[6] Written authorization is issued upon approval of the bond required of the operator pursuant to section 144.86.
[7] For somewhat dated discussions of the federal environmental statutes and the extent to which each addresses Indian tribes, see Will, Indian Lands Environment — WhoShould Protect It?, 18 Natural Res. J. 465, 474-87 (1978); Schaller, The Applicability of Environmental Statutes to IndianLands, 2 (8) Am. Indian J. 15 (1976).
[8] The EPA's authority to make such a determination has been upheld by the Ninth Circuit. State of Wash., Dept. of Ecology v.U.S.E.P.A., 752 F.2d 1465 (9th Cir.).
[9] A number of authors have suggested that the optimal approach to on-reservation environmental protection is the assumption of full responsibility by the tribes. See Will, IndianLands Environment — Who Should Protect It?, 18 Natural Res. J. 465 499 (1978); Comment, The Applicability of the FederalPollution Acts to Indian Reservations. A Case for TribalSelf-Government, 48 U. Colo. L. Rev. 63, 93 (1976).
[10] EPA Policy for Program Implementation on Indian Lands, Dec. 19, 1980, at 5, quoted in State of Wash. Dept. of Ecology,752 F.2d at 1471.
[11] EPA Office of Federal Activities, Administration ofEnvironmental Programs on Indian Lands 35 (1983), quoted in Stateof Wash. Dept. of Ecology, 752 F.2d at 1471 n. 7.
[12] The exception is state jurisdiction over hazardous waste management. As noted previously, the EPA, in granting Wisconsin final authority to operate its hazardous waste management program in lieu of the federal program, specifically exempted Indian lands. 51 Fed. Reg. at 3784. Authority under RCRA "on Indian lands" was reserved to the federal agency. This retained federal jurisdiction apparently would extend to all mining activity, whether conducted by the tribe or by a non-Indian lessee, on tribal lands within the reservation boundaries.
[13] For an argument that federal regulations preempt state environmental regulation of mineral lessees, see Comment, TheApplicability of the Federal Pollution Acts to IndianReservations: A Case for Tribal Self-Government, 48 v. Colo. L. Rev. 63, 81 86 (1976); Comment, The Developing Test for StateRegulatory Jurisdiction in Indian Country: Application in theContext of Environmental Law, 61 Ore. L Rev. 561, 583-84 (1982). *Page 247