819 F.2d 895
 The CROW TRIBE OF INDIANS; Forest Horn, a member of the
Crow Tribe and Chairman of Crow Tribal Council; Ted Hogan,
a member of the Crow Tribe and Secretary of the Crow Tribal
Council; Jiggs Yellowtail, a member of the Crow Tribe;
Barney Old Coyote, a member of the Crow Tribe, Plaintiff-Appellant,
United States of America, Plaintiff-Intervenor,
v.
STATE OF MONTANA, Defendant-Appellee.
The CROW TRIBE OF INDIANS, Plaintiff-Appellant,
and
United States of America, Plaintiff-Intervenor-Appellant,
v.
The STATE OF MONTANA, Defendant-Appellee,
and
Westmoreland; Westmoreland, Westmoreland Resources, Inc.,
Defendant-Intervenor-Appellee.
 Nos. 86-3842, 86-3845.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1987.
Decided June 11, 1987.
 
 Clay R. Smith, Helena, Mont., and John W. Ross, Billings, Mont., for defendant-appellee.
 Gerald B. Murphy, Billings, Mont., and William A. White, Philadelphia, Pa., for appellees.
 Daniel M. Rosenfelt, Albuquerque, N.M., for plaintiffs-appellants.
 N. Jean Bearcrane, Billings, Mont., for appellant.
 Laura E. Frossard, Washington, D.C., for plaintiff-intervenor-appellant.
 Appeal from the United States District Court for the District of Montana.
 Before BROWNING, WRIGHT, and HALL, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 This case, which comes before us a second time, presents two primary issues: (1) does federal action preempt the application of Montana's coal taxes to coal mined on Indian tribal property; and (2) do these taxes infringe unlawfully on the Crow Indians' tribal sovereignty? We answer both questions in the affirmative and reverse the judgment of the district court.
 
 PROCEDURAL HISTORY
 
 2
 This is an appeal by the Crow Tribe, with the United States intervening on behalf of the Tribe, from a district court judgment upholding the application of Montana taxes on coal extracted from tribal land. The district court abstained from deciding whether the taxes could be imposed on revenues from coal mined on the reservation proper. It found that issue nonjusticiable.
 
 
 3
 The Crow Tribe brought action against Montana in 1978, joining three Montana counties and their treasurers. That action sought declaratory and injunctive relief against the imposition of the state's severance and gross proceeds taxes on coal mined from the reservation and what has been referred to as the "ceded strip."
 
 
 4
 The district court dismissed that action for failure to state a claim. Crow Tribe of Indians v. Montana, 469 F.Supp. 154 (D.Mont.1979). This court reversed and remanded. Crow Tribe of Indians v. Montana (Crow I ), 650 F.2d 1104 (9th Cir.1981), amended, 665 F.2d 1390 (1982). We indicated that if the Tribe could show that the Montana taxes deprived it of "a large portion of the economic benefits of its coal," Crow I, 650 F.2d at 1113, or "diminish[ed] the Tribe's own power to regulate," id. at 1114, these taxes would conflict with federal statutes that were intended to allow Crow to regulate the development of its natural resources. Our decision provided, however, that if Montana showed that these taxes were "carefully tailored to effectuate the state's legitimate interests, [they] might survive." Id.
 
 
 5
 Upon remand, the district court upheld the application of Montana taxes to coal extracted from the "ceded area" and abstained from deciding whether the taxes could be imposed on revenue from coal mined on the reservation proper, 657 F.Supp. 573.
 
 FACTS
 
 6
 In 1904, Congress enacted legislation requiring the Crow Tribe to cede to the United States its interests in the surface area and underlying minerals of a portion of its reservation ("the ceded strip"). Act of April 27, 1904, Ch. 1624, 33 Stat. 352; Little Light v. Crist, 649 F.2d 682, 685, 689 (9th Cir.1981). The United States was to hold in trust for Indians the surface area and underlying mineral rights to the ceded strip. The United States was to sell the property and pay the proceeds to the Indians. Id. Approximately 98% of the surface area of the "ceded strip" was conveyed to non-Indians.
 
 
 7
 The government conveyed ceded strip properties in different forms: (1) rights to both the surface area and underlying minerals and (2) rights to the surface area only. A portion of the ceded strip was never conveyed, leaving both the surface area and underlying mineral interests in a trust held by the United States for the benefit of the Crow Tribe.
 
 
 8
 In 1934, Congress enacted the Indian Reorganization Act (IRA), 25 U.S.C. Secs. 461-479 (1982), which returned to the various tribes previously ceded lands and underlying minerals. The Act transferred ownership rights from the United States back to the Indians. The tribes involved could choose to accept or decline the arrangement. Crow declined.
 
 
 9
 In 1958, Congress passed another Indian Restoration Act, which required Indians to accept ownership of vacant lands ceded previously. It restored the previously undisposed minerals to the full beneficial ownership of the Crow Tribe. This terminated the United States' right to lease or sell these minerals for the Tribe. The parties agree that the Tribe owns these minerals underlying the ceded area, but whether they are now part of the Crow reservation is disputed.
 
 
 10
 In 1972, the Tribe leased to Westmoreland Resources the rights to mine coal underlying the ceded strip. The surface area of the leased land had been sold to non-Indians. Rights to the underlying minerals had not been conveyed. Such leasing activity is governed by the Mineral Leasing Act of 1938, 25 U.S.C. Secs. 396a-g (1982), and regulations promulgated thereunder.
 
 
 11
 In 1975, Montana imposed two taxes on all coal producers. The first was a severance tax, "imposed on each ton of coal produced in the state." Mont.Code Ann. Sec. 15-35-103 (1985). The rate varies from three to 30% of the coal's value, depending on quality and whether the mining is on the surface or underground.
 
 
 12
 The second tax is the gross proceeds tax, imposed on each person engaged in coal mining. Mont.Code Ann. Sec. 15-23-701. The rate is determined by applying the relevant county's property tax to the assessed value of the coal producer's gross yield from coal contract sales. The amount varies by county and year.
 
 
 13
 Between 1975 and 1982, Westmoreland paid $53,800,000 in severance taxes and $8,100,000 in gross proceeds taxes for its ceded strip mining operations. Westmoreland has since paid $20,000,000 on these taxes to the district court registry.
 
 
 14
 In 1976, the Tribe imposed its own severance tax of 25% for coal mined on the reservation. In 1982, it enacted a similar tax for coal mined on the ceded strip. The Department of Interior rejected the latter tax because the Crow constitution disclaimed tribal jurisdiction over the ceded strip. In 1982, Westmoreland agreed to pay the tribal tax, but received credit for the coal taxes paid to Montana. Hence, it has paid no severance tax to Crow.
 
 
 15
 Interior approved the application of Crow severance taxes to coal produced on the reservation proper. In 1980, Shell Oil and Crow agreed to a lease contract for mining coal on the reservation. It required Shell to pay Crow an amount equal to the Montana coal taxes less whatever was required to be paid to the state.
 
 
 16
 Shell never began to mine, being unwilling to begin digging because it was unable to find a buyer for its coal. It surrendered its rights to the mine in December 1985.
 
 DISCUSSION
 I. Preemption
 
 17
 The district court found that the minerals underlying the ceded strip were technically outside the reservation boundaries. It held that tribal activities conducted outside the reservation "present different considerations" than do activities conducted within. " 'Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.' " (Quoting, Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)). The district court stated also that, in order for the taxes to be preempted, there would have to exist federal legislation that "expressly bars ... Montana ... from imposing its coal taxes." It found no express federal prohibition against the taxes and, therefore, held they were not preempted.
 
 
 18
 The court erred in these findings and in the conclusions of law, which we review de novo. United States v. McConney, 728 F.2d 1195 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The district court's legal conclusions deviate from this court's 1981 opinion and misapply recent Supreme Court cases that establish the relevant preemption analysis. We found, contrary to the district court, that the underlying minerals are a "component of the reservation land itself." Crow I, 650 F.2d at 1117. This follows the plain meaning of the 1958 Act, which restored to reservation status all lands returned to tribal ownership under the Act.
 
 
 19
 Title to the lands restored to tribal ownership by this Act shall be held by the United States in trust for the respective tribe or tribes, and such lands are hereby added to and made part of the existing reservations for such tribe or tribes.
 
 Act of May 19, 1958, 72 Stat. 121.[1]
 
 20
 The law of the case as expressed in our previous opinion has been ignored. We held in Crow I that, irrespective of the location of the tribal coal on or off the reservation, the Mineral Leasing Act of 1938, 25 U.S.C. Secs. 396a-396g (1982), applied to the Tribe's coal leases. Crow I, 650 F.2d at 1114 n. 16.
 
 
 21
 The preemption analysis in Indian tribal cases differs from that used in other circumstances. Crow I, 650 F.2d at 1109 (citing White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 140, 149, 100 S.Ct. 2578, 2581, 2586, 65 L.Ed.2d 665 (1980)); see also Ramah Navajo School Board v. Bureau of Revenue, 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982). Congress attaches great significance to the "firm federal policy of promoting tribal self-sufficiency and economic development." Crow I, 650 F.2d at 1109 (quoting Bracker, 448 U.S. at 140, 100 S.Ct. at 2581); see also California v. Cabazon Band of Mission Indians, --- U.S. ----, 107 S.Ct. 1083, 1092, 94 L.Ed.2d 244 (1987); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334-35, 103 S.Ct. 2378, 2386-87, 76 L.Ed.2d 611 (1983). It intended that this policy be given "broad preemptive effect." Crow I, 650 F.2d at 1109. Moreover, "[n]o express congressional statement of preemptive intent is required; it is enough that the state law conflicts with the purpose or operation of a federal statute, regulation, or policy." Id. (emphasis added).
 
 
 22
 We have already indicated that the purpose of the 1938 Act was, inter alia, to revitalize tribal governments by giving them control over the lease of their lands subject to the approval of the Secretary of Interior, and to promote tribal economic development. Crow I, 650 F.2d at 1112-13; see also Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 767 n. 5, 105 S.Ct. 2399, 2404 n. 5, 85 L.Ed.2d 753 (1985) (a major purpose of the 1938 Act is "to ensure that Indians receive 'the greatest return from their property' ") (quoting S.Rep. No. 2, H.R.Rep. No. 1872, 75th Cong., 3d Sess. 2 (1938)).
 
 
 23
 If the Tribe demonstrates that the taxes imposed by the state interfered with the policies underlying the 1938 Act, the taxes will be subject to preemption. Crow I, 650 F.2d at 1113; see also Cabazon, 107 S.Ct. at 1092.
 
 
 24
 A. Interference with Tribal Economic Interests
 
 
 25
 We review for clear error the district court's finding that the Montana taxes did not interfere with federal or tribal court policies. Fed.R.Civ.P. 52(a); LaDuke v. Nelson, 762 F.2d 1318, 1321 (9th Cir.1985).
 
 
 26
 The district court did not find that the taxes interfered with federal Indian law and policies. Rather, it found that Westmoreland's marketing problems were due to a decrease in coal demand from Montana's traditional coal buyers.
 
 
 27
 Montana argues that its taxes do not burden Crow's economic interests because the Tribe itself does not pay the tax. In other words, the taxes were imposed on the lessee, Westmoreland, and the Tribe had no duty to reimburse. So, says Montana, the Tribe's economic interests were not affected.
 
 
 28
 We have already rejected this argument. Crow I, 650 F.2d at 1113 n. 13. The state taxes increase the costs of production by the coal producers, reducing in turn the royalty that can be paid the Tribe. The taxes also forced the coal producers to charge higher prices, reducing the demand for their Montana coal and resulting in fewer sales for the producers and fewer royalties to the Tribe.
 
 
 29
 Montana argues that it may impose these taxes under Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). Colville held that the state could tax cigarettes purchased by non-Indians at tribal smokeshops. Id. at 161, 100 S.Ct. at 2085. Principles of preemption and tribal self-government do not authorize Indian tribes to "market an exemption from state taxation to persons who would normally do their business elsewhere." Id. at 155, 100 S.Ct. at 2082.
 
 
 30
 But the Court has distinguished Colville from cases in which the Tribe was trying to market a product generated on the reservation by activities in which the Tribe had a strong interest. See Cabazon, 107 S.Ct. at 1093-94. In Cabazon, the Court held that state regulation of Indian-run bingo games was preempted by federal action. Id. at 1092-95. Unlike the tobacco sold in Colville, bingo was not a product that the Indians imported for resale to non-Indians. Id. at 1093.
 
 
 31
 The Indians had invested considerable time and resources into the enterprise. Id. at 1094. The tribes there were "generating value on the reservations through activities in which they have a substantial interest." Id. The Court in Cabazon explicitly noted that this was not the case in Colville. The tribes were merely marketing their exemption from state cigarette taxes. Id. at 1093.
 
 
 32
 Clearly, this case resembles Cabazon more than it does Colville. The coal is the Tribe's property, a natural resource. Its lease brings revenue that represents value generated by tribal activities and in which the Tribe has a substantial interest. Colville does not apply.
 
 
 33
 We should consider the economic aspects and the practical effects of Montana's severance and gross proceeds taxes.[2]
 
 
 34
 The Tribe cites a study prepared by an economic research firm, referred to as the NERA report. It showed that the Montana coal tax forced coal producers to raise coal prices. That resulted in reduced demand for Montana coal. Montana's customers stopped buying from Montana producers and went to Wyoming and other states that have lower coal taxes. The report says that in 1975, before the taxes were imposed, Montana accounted for 40.6% of the Northern Great Plains coal output. Wyoming produced 43.8%. In each subsequent year, Montana has lost, while Wyoming has gained, in the percentage of this region's coal production. By 1982, Montana produced 18.2%, and Wyoming 69.5%, of the region's coal output.
 
 
 35
 Production by the coal producers on Crow tribal properties fell from 7.4 to 2.78% during that time. The NERA report concluded that the taxes prevented Crow coal from competing with that of Wyoming and resulted in far less Crow coal production than would have otherwise occurred.
 
 
 36
 Montana counters that the NERA report is unreliable. It refers to testimony that the report was "grounded on a supply [and] demand theory which failed to consider adequately the myriad of factors influencing a [buyer's] determination to use certain coal." Montana's expert accounted for the differences in production by noting Wyoming coal's lower sulfur content, and the increased population in Wyoming's traditional buyer markets. Further, says Montana, the taxes when factored into total coal sales constituted only one to three percent of the price.
 
 
 37
 Montana places some emphasis also on the cost of coal transportation and says that, for distances of more than 1,100 miles, it costs less to ship Wyoming coal than it does Montana coal. This had a far greater impact on price than did the taxes, Montana argues.
 
 
 38
 From all of this, one must conclude that the taxes imposed are the components that differ most clearly between Montana and Wyoming. The timing of the loss in coal production in Montana and the losses sustained by the Crow Tribe correspond exactly with the imposition of taxes. The district court erred in relying on transportation costs. Coal production from areas in Montana just across the Wyoming border decreased after the taxes were imposed, while the Wyoming production experienced a large increase.
 
 
 39
 Montana has failed to rebut evidence that the taxes had at least some negative impact on the coal's marketability. The district court did not find the impact of taxes to be negligible. As long as the taxes "interfere[ ] or [are] incompatible with federal and tribal interests reflected in federal law," they are deemed preempted "unless the state interests at stake are sufficient to justify the assertion of state authority." Cabazon, 107 S.Ct. at 1092 (quoting Mescalero, 462 U.S. at 333-34, 103 S.Ct. at 2386). Any finding of interference, then, would be enough to subject the state taxes to preemption. This record shows interference. The district court erred in failing to so find.
 
 B. Legitimacy of State Interests
 
 40
 If the state coal taxes conflict and interfere with federal or tribal objectives, we must review the legitimacy of the state's interests, and the relationships of the taxes to achieving those interests. Crow I, 650 F.2d at 1113-14; see also Bracker, 448 U.S. at 148-49, 100 S.Ct. at 2586 (to justify its assessment of taxes, state must identify a regulatory function or a service it performs).
 
 
 41
 We have identified interests that we thought might justify these taxes: (a) the additional government services required by miners and others involved in coal production; and (b) the costs of treating the pollution and solid waste disposal that attend coal production. Crow I, 650 F.2d at 1114.
 
 
 42
 The district court found that Montana and its political subdivisions provided numerous services to the ceded strip. It held that the costs of these services could not be documented precisely and were unquantifiable. The court said that many of coal mining's effects were unknown: "[f]or example, reclamation is not yet complete and its degree of success is uncertain." The court said that some of coal mining's effects could be identified if not precisely quantified, e.g., air and water pollution, soil and plant damage, harmed wildlife, and road wear. It noted also the socioeconomic effects of the Westmoreland mine, particularly the disruption in the lives of those living on the ceded strip. The court observed that the burden of providing services had fallen upon state and local governments, not upon the Tribe.
 
 
 43
 These findings are correct, says Montana. It cites expert testimony that the appellant's NERA report failed to consider environmental and other long term consequences of coal development. Montana contends that it is not necessary to account for all the economic and social factors in setting its tax rate.
 
 
 44
 The state cites The Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), which on its face seems to apply. But there the issue was whether a state's coal severance tax violated the Commerce or Due Process Clauses because the amount of tax revenues was not "fairly related" to the government services required by coal mining. Id. at 620, 101 S.Ct. at 2955. That analysis differs from the one used to determine whether state actions affecting Indians are preempted by existing federal policy. In denying Montana's petition for rehearing in the previous appeal, we rejected expressly Commonwealth Edison. Crow Tribe v. Montana, 665 F.2d 1390, 1391 (9th Cir.1982) (amending Crow I ).
 
 
 45
 We held that the preemption analysis requires a court to consider the state's legitimate interests. Ultimately the question is one of reviewing the state, federal, and tribal interests involved and whether, in this context, the state action is contrary to federal action.
 
 
 46
 In Cabazon, the Supreme Court stated that "the federal tradition of Indian immunity from state taxation is very strong and ... the state interest in taxation is correspondingly weak. Accordingly, it is unnecessary to rebalance these interests in every case." 107 S.Ct. at 1091 n. 17 (emphasis added). The Supreme Court has increased the presumption against finding legitimate state interests. Hence, even if we agree with the district court that Montana taxes support legitimate interests, the interests described in Crow I, and argued by Montana, may no longer be sufficient.
 
 The Court found in Cabazon that:
 
 47
 [t]he tribal [bingo] games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members. The Tribes' interests obviously parallel the federal interests.
 
 
 48
 Id. at 1093.
 
 
 49
 The same may be said here. Coal production is vital to the economic development of the Crow Tribe. Like the bingo games, Crow's coal leases "generate funds for essential Tribal service and provide employment for Tribal members." Id. at 1094.
 
 
 50
 Given the significance Cabazon attaches to these federal and tribal interests, Montana faces a heavy burden in overcoming these with a showing of legitimate state interests. Even if Montana's interests are sufficiently legitimate, there is substantial evidence that the coal taxes are not narrowly tailored to support them.
 
 
 51
 C. Relationship Between Taxes and State Interests
 
 
 52
 The district court was unable to quantify or forecast the current or future costs resulting from coal development. It ignored hard evidence. The NERA report concluded that from 1970 to 1982, population growth associated with coal mining resulted in $38 million of government costs. But for that period, state, local, and excise taxes, other than the coal taxes, provided state and local governments with $42 million.
 
 
 53
 There may be additional costs associated with treating the environmental consequences of coal production, but the state failed to provide a specific figure. Instead it would charge a heavy tax for indeterminable future costs, imposing on the Tribe the burden of the doubt.
 
 
 54
 It appears further that many of these environmental concerns have been addressed already by federal and state regulations. Montana's environmental interests are protected by the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. Sec. 1201, et seq. (1982), which imposes surface mine bonding and reclamation fee requirements. Id. at Secs. 1258, 1269. EPA and state programs carefully regulate point source discharge from the mines.
 
 
 55
 The district court found that state taxes were narrowly tailored to achieve legitimate interests. This is undermined by Montana's use of these tax revenues. The severance tax statute requires that 50% of the revenues be allocated to a permanent trust fund and, according to the NERA report, 19 to 30% to the state general fund. Mont.Code Ann. Sec. 15-35-108 (1985). These two funds are not dedicated to environmental or coal-related services. The three coal-related funds established by the severance tax statute were to be initially allocated 31% of the severance tax revenues. As of 1981, they received only 8.75%. This indicates a distant, rather than carefully tailored, relationship between the severance tax revenues and the coal-related services.
 
 
 56
 It appears that Montana intended, at least to some extent, to use the taxes to profit from the Indians' valuable coal resources:
 
 
 57
 [t]he Montana legislature predicated its tax upon a finding that strip coal 'is in sufficient demand that at least one-third of the price it commands at the mine may go to the economic rents of royalties and production taxes.' ... Mont.Code Ann. Sec. 15-35-101(1)(e). By setting the severance tax rate at 30 percent of value, Montana made plain its intention to appropriate most of the economic rent.
 
 
 58
 Crow I, 650 F.2d at 1113. We stated that the Tribe's coal "is not the state's to regulate.... it has no such legitimate interest in appropriating Indian mineral wealth." Id. at 1114.
 
 
 59
 Accordingly, even if we assume Montana's interests were legitimate, the district court clearly erred in finding that the taxes were narrowly tailored to achieve them. Montana coal taxes are preempted.
 
 II. Tribal Sovereignty
 
 60
 The district court concluded as a matter of law that the Montana taxes do not infringe on tribal sovereignty. It reasoned that the application of the state's coal taxes to tribal coal mined in the ceded area did not infringe upon tribal self-government because the coal lay outside the reservation. It erred in this conclusion because the minerals underlying the ceded area are owned by the Tribe and are considered part of the Crow Reservation. See Crow I, 650 F.2d at 1117.
 
 
 61
 The self-government doctrine differs from the preemption analysis and is an independent barrier to state regulation. Bracker, 448 U.S. at 142-43, 100 S.Ct. at 2583; Crow I, 650 F.2d at 1110. Either is a sufficient basis to hold the state tax inapplicable to tribal coal. Bracker, 448 U.S. at 143, 100 S.Ct. at 2583.
 
 
 62
 Whether the state taxes infringe on tribal sovereignty depends on whether tribal self-government is affected. Crow I, 650 F.2d at 1116. The power to tax members and non-Indians alike is an essential attribute of self-government. Kerr-McGee Corp. v. Navajo Tribe of Indians, 471 U.S. 195, 201, 105 S.Ct. 1900, 1904, 85 L.Ed.2d 200 (1985). Any assertion of state authority over tribal interests must be assessed against the traditional notions of Indian sovereignty. Mescalero, 462 U.S. at 334, 103 S.Ct. at 2386. State action may not infringe unlawfully "on the right of reservation Indians to make their own laws and be ruled by them." Bracker, 448 U.S. at 142, 100 S.Ct. at 2583 (quoting Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959)).
 
 
 63
 Tribal sovereignty contains a significant geographical component, and tribes have the power to manage the use of their territory and resources by both members and nonmembers. Mescalero, 462 U.S. at 335, 103 S.Ct. at 2387; Bracker, 448 U.S. at 151, 100 S.Ct. at 2587. Taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation is not permissible absent congressional consent. Cabazon, 107 S.Ct. at 1091 n. 17 (citing McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)).
 
 
 64
 While the federal tradition of Indian immunity from state taxation is very strong, see id., this court has recognized that a state tax is not invalid merely because it deprives the Tribe of revenues used to sustain itself and its programs. Crow I, 650 F.2d at 1116. The principle of tribal self-government is to seek "an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." Colville, 447 U.S. at 156, 100 S.Ct. at 2082.
 
 
 65
 Montana taxes mineral resources that are "a component of the reservation land itself." Crow I, 650 F.2d at 1117. The tax revenue from coal production could generate funds for tribal services and provide employment for tribal members. Mescalero, 462 U.S. at 341, 103 S.Ct. at 2390. By taking revenue that would otherwise go towards supporting the Tribe and its programs, and by limiting the Tribe's ability to regulate the development of its coal resources, the state tax threatens Congress' overriding objective of encouraging tribal self-government and economic development. See Mescalero, 462 U.S. at 341, 103 S.Ct. at 2390; Bracker, 448 U.S. at 149, 100 S.Ct. at 2586. While some interference with the Tribe's economic development may be justified if the state's interests in imposing the taxes are legitimate, Crow I, 650 F.2d at 1113; Colville, 447 U.S. at 163, 100 S.Ct. at 2086, the State has not shown that its taxes are narrowly tailored to meet these interests. We conclude that the Montana tax is invalid because it erodes the Tribe's sovereign authority.
 
 III. Coal Within Reservation Boundaries
 
 66
 The district court declined to rule whether the taxes applied to coal mined within the external boundaries of the reservation. Although Shell Oil Company had an agreement with the Tribe to mine this coal, it never did so. Because of that, the district court found there was no substantial controversy with this issue.
 
 
 67
 We disagree. The Tribe need not wait for mining to commence to challenge the taxes' application to coal mined within the Reservation boundaries. See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (it is not necessary to await the consummation of a threatened injury to obtain preventive relief); State of Arizona v. Atchison, Topeka, & Santa Fe R.R. Co., 656 F.2d 398, 402-03 (9th Cir.1981) (court may enter declaratory judgment as to validity of tax even though action is commenced prior to the effective date of the tax scheme).
 
 
 68
 The taxes are already in effect and Montana intends to apply them to this coal. These high taxes affect tribal revenues by interfering with the Tribe's coal leasing efforts. Because of the taxes, the lessee cannot find a buyer, making it difficult for Crow to find a lessee.
 
 
 69
 These taxes burden the Tribe's interests in coal within the Reservation boundaries, just as they do its interests in coal from the ceded strip, as these interests are the same. The reasons for disallowing these taxes on coal from the ceded strip apply with equal force to the coal within the Reservation boundaries.
 
 CONCLUSION
 
 70
 Montana's coal taxes are preempted by federal law and policies. They interfere with tribal economic development and autonomy. The state interests they promote may or may not be sufficiently legitimate to overcome these conflicts, but even if they are, the taxes are not narrowly tailored in pursuit of these interests.
 
 
 71
 In addition, the taxes are void for interfering with tribal self-government, a separate and independent barrier to state regulation of Indian affairs. The mineral estate of the ceded strip is legally part of the Crow reservation, and taxing Indian income derived from activities conducted on reservation property is prohibited without congressional consent. Here, Congress did not consent. Montana's interests in imposing the coal taxes do not overcome the tribe's economic and governmental interests in coal production.
 
 
 72
 Finally, because taxes on coal mined on the ceded strip are invalid, taxes on coal from the reservation proper are likewise invalid. The district court erred in holding this question nonjusticiable. The taxes impair the tribe's ability to negotiate leases with Shell Oil and other coal companies. They also reduce tribal revenues by impairing the coal's marketability.
 
 
 73
 REVERSED.
 
 
 
 [1]
 The 1958 Act does not give the Tribe jurisdiction over the surface of the ceded strip. The Act restored only the mineral interests to tribal ownership. These interests were once part of the reservation and remain adjacent to it
 
 
 [2]
 Figures submitted by the Crow Tribe tell us that the Montana taxes totalled an effective rate of 32.9%, more than twice that of any other state's coal taxes. Montana counters that the effective rate is 21-22%. It appears that experts for the parties reached different results because they used different methods of calculating the effective tax rates