745 P.2d 1170

**COTTON PETROLEUM, et al.,
Plaintiffs–Appellants,**

v.

**STATE of New Mexico, et al.,
Defendants–Appellees.**

No. 9268.

Court of Appeals of New Mexico.

Sept. 17, 1987.

Certiorari Quashed Nov. 10, 1987.

Daniel H. Israel and Jane E. Lein, Cogswell and Wehrle, Denver, Colo., G. Samuel Schaunaman, II, Gen. Atty., Cities Service Oil & Gas Corp., Caroline B. Benediktson, Cotton Petroleum Corp., Tulsa, Okl., Sarah E. Bennett, Rothstein, Bailey, Bennett, Daly & Donatelli, Santa Fe, for plaintiffs-appellants.

Hal Stratton, Atty. Gen., Paula Forney–Thompson, Frank D. Katz, Carolyn Wolf and Daniel Yohalem, Sp. Asst. Attys. Gen., Taxation and Revenue Dept., Santa Fe, for defendants-appellees.

B. Reid Haltom, Nordhaus, Haltom, Taylor & Taradash, Albuquerque, for the Jicarilla Apache Tribe, amicus curiae.

## OPINION

BIVINS, Judge.

This appeal presents the question of whether certain oil and gas taxes imposed by the state against a non-Indian producer whose operations are located on an Indian Reservation constitute an impermissible burden on interstate commerce. We hold they do not and affirm the district court.

Cotton Petroleum and its sister corporation, United Crude Company (Cotton), produce and market oil and gas on approximately 15,000 acres of tribal trust land located on the Jicarilla Indian Reservation (Reservation) under five oil and gas leases issued by the Jicarilla Apache Tribe (Tribe). Cotton pays a royalty to the Tribe of 12½% plus rent of $125 per acre, and an over-riding royalty of an additional 12½% to the assigners of the leases. In addition, Cotton pays to the Tribe two oil and gas related taxes that equal approximately 6% of its production.

Cotton also pays to the state five oil and gas production taxes equal to approximately 8% of its production.[1] It challenges only the two most substantial taxes: the severance tax, Sections 7–29–1 to –22; and the oil and gas emergency school tax, Sections 7–31–1 to –25. Because of the overlapping tribal and state taxes, Cotton's overall oil and gas tax burden is approximately 14% of value compared to off-the-Reservation producers who pay only 8% of value in production taxes. Contending it should not have to pay both tribal and state oil and gas taxes, Cotton sought relief.

Cotton brought two actions in district court. The first sought a refund of taxes paid under protest. *See* §§ 7–29–12 and 7–31–15 (since repealed, but in effect at the time suit was filed). In addition to seeking a refund, Cotton also asked for declaratory and injunctive relief. The second, a mandamus action, sought refund for taxes "erroneously paid" from March 1981 to April 1982, a time when no protests were filed. *See* §§ 7–29–11 and 7–31–14. These actions were consolidated and the district court granted the Tribe's motion to become an amicus curiae. After rendering a decision containing its findings of fact and conclusions of law, the district court entered a judgment denying Cotton the relief requested. From that judgment Cotton appeals. In addition to the primary issue framed at the outset, Cotton argues that mandamus is an appropriate remedy to obtain relief for taxes paid without protest.

---

**1.** The five taxes are New Mexico Oil and Gas Severance Tax, NMSA 1978, Sections 7–29–1 to –22 (Repl.Pamp.1983); the New Mexico Oil and Gas Conservation Tax, NMSA 1978, Sections 7–30–1 to –26 (Repl.Pamp.1983); the New Mexico Oil and Gas Emergency School Tax, NMSA 1978, Sections 7–31–1 to –25 (Repl.Pamp.1983); the New Mexico Oil and Gas Ad Valorem Production Tax, NMSA 1978, Sections 7–32–1 to –27 (Repl.Pamp.1983); and the New Mexico Oil and Gas Production Equipment Ad Valorem Tax, NMSA 1978, Sections 7–34–1 to –20 (Repl.Pamp. 1983).

Because we uphold the constitutionality of the taxes paid, we do not reach that issue.

This appeal is unique in that the primary parties differ sharply as to the proper legal approach to apply. The state argues for the traditional preemption analysis under Indian law as applied in cases such as *Ramah Navajo School Board, Inc. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), and *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). *See also Crow Tribe of Indians v. Montana*, 819 F.2d 895 (9th Cir.1987). In the alternative, the state contends the challenged taxes survive scrutiny under standard Commerce Clause tests announced in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) and applied in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981).

While agreeing with the state that the preemption analysis should be applied, the Tribe argues the state taxes will not survive that analysis. The Tribe, in its amicus brief, urges us to examine the state taxes "in terms of federal preemption of state law or unlawful infringement by state law on the right of reservation Indians to make their own laws."

Cotton, on the other hand, contends that this case is not a preemption case because the economic impact on the Tribe is minimal and is not a primary consideration.[2] Cotton urges this court to use preemption only as a backdrop to focus on the issue of multiple taxation. It asks us to adopt a new analysis to apply to non-Indian producers who enter into lease agreements with tribes for on-the-reservation operations.

No party disputes the *Tribe's* right to tax the mineral companies that do business on the Reservation. What Cotton challenges is the additional imposition of *state* taxes on such companies. In so challenging the taxes, Cotton contends that the traditional Commerce Clause analysis of *Commonwealth* should not apply. Rather than requiring the amount of tax to be fairly related to services provided by the state, Cotton contends that the amount of tax should equal the benefits conferred. Cotton asks us to apportion the state taxes in relation to services provided. Where there is no economic impact on the Tribe, but there are multiple taxes imposed by the Tribe and the state, Cotton urges us to strike the state taxes currently imposed as an impermissible burden on interstate commerce.

In its judgment, the district court focused on the preemption analysis and determined that, because there was no impact on the Tribe, Cotton could not be relieved of the payment of state taxes. The district court also concluded that there was no legal requirment that expenditures equal revenues collected. Cotton contends that the state can impose the severance tax and emergency school tax only when the state shows such taxes are required to support state services to the activity subject to state taxation. Because the Tribe imposes its own taxes, which are primary, Cotton views the state taxes as imposing an impermissible multiple taxation burden on it.

Cotton bases its contentions upon footnote 26 of *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 158–59, 102 S.Ct. 894, 912–13, 71 L.Ed.2d 21 (1982):

> [W]hen the activity taxed by the Tribe occurs entirely on tribal lands, the multiple taxation issue would arise only if a *State* attempted to levy a tax on the same activity, which is more than the *State's* contact with the activity would justify. In such a circumstance, any challenge asserting that tribal and state taxes create a multiple burden on interstate commerce should be directed at the state tax, which, in the absence of congressional ratification, might be invalidated under the Commerce Clause.

Cotton claims the state's taxes are not justified in relation to the services provided to the Reservation by the state, and that the "focus of the 'particularized inquiry' [into federal, state and tribal interests] mandat-

---

**2.** The district court's judgment holds that Cotton has standing to assert preemption and the state does not contend otherwise in its brief.

ed by the United States Supreme Court is the balance or imbalance in state revenues generated off the Jicarilla Reservation when considered in light of State services and infrastructure provided the Reservation." Cotton provides extensive discussion and figures of the alleged disparity in taxes collected and benefits conferred. For example, Cotton points to evidence showing that for the tax years in question, 1981–1985, New Mexico provided services to Cotton's operations of only $89,384, while receiving in taxes for the same period $2,293,953. It also compares state services to the Reservation as a whole of $10,704,-748 for years 1981–1985 with oil and gas revenues from all producers on the Reservation of $47,483,306. Thus, says Cotton, with a ratio of 5 to 1, New Mexico enjoys an "unlawful windfall." Cotton asserts that the state may "only impose its tax 'in return for the governmental functions it provides to those who must bear the burden of paying this tax.'" *Ramah Navajo School Bd., Inc. v. Bureau of Revenue.* Because the state has not provided many services, Cotton contends the taxes must fail.

Whether the state may tax a non-Indian oil and gas producer, in addition to taxes imposed by the Tribe has not been squarely decided by the United States Supreme Court. The footnote in *Merrion,* upon which Cotton relies, does not, as Cotton asserts, create a "Supreme Court mandate" or a "specific cause of action" to be used against the state. The footnote is dictum; indeed, the Court stated "no opinion on the possibility of such a challenge." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. at 159 n. 26, 102 S.Ct. at 913 n. 26. The Court intimated only that a state tax "might" be invalidated under the Commerce Clause if the state failed to justify it.

Using *Merrion,* Cotton attempts to carve an exception to the traditional *Commonwealth* test. Cotton states that state severance taxes "are, as a matter of law, primary and hence not subject to a commerce clause claim;" likewise, tribal taxes are primary and hence not subject to a Commerce Clause claim. Moreover, it concedes that had its operations been off the

Reservation, "Cotton could not challenge the New Mexico taxes under *Commonwealth.*" Therefore, as we understand Cotton's argument, a traditional Commerce Clause analysis does not apply, and we must devise a new test comparing costs and benefits.

Cotton's position conflicts with established tax principles. There is no requirement that benefits conferred must equal taxes extracted. *Ramah Navajo School Bd., Inc. v. Bureau of Revenue; Commonwealth Edison Co. v. Montana.* Where taxes overlap, as here with both tribal and state taxes imposed on the same activity, the proper test, we believe, is the one set out in *Commonwealth.* According to this test, a state tax does not offend the Commerce Clause if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. at 279, 97 S.Ct. at 1079.

We note that *Commonwealth* examined the impact of a state tax on an activity occurring mostly on federal land. We believe the analysis is equally applicable to the imposition of a state tax on an activity occurring on tribal land.

Under the *Commonwealth* analysis, there can be no argument that the substantial nexus requirement is met. Because Cotton's leases are located within New Mexico, the severance of minerals occurs entirely within the state.

Second, apportionment is not strictly an issue because no other state is taxing the severance. Even if we were to assume that a tribe were a state for purposes of this prong (and *White Mountain Apache Tribe v. Bracker* states otherwise), Cotton has cited no cases on multiple taxation to support its claim that *Merrion's* footnote 26 creates an exception to the *Commonwealth* test. *See In re Adoption of Doe,* 100 N.M. 764, 676 P.2d 1329 (1984) (the court need not review issues for which no authority is cited). Neither has Cotton

shown evidence that the state tax unduly burdens or discriminates against interstate commerce. *Merrion v. Jicarilla Apache Tribe.* "[D]ifferent sovereigns can enjoy powers to tax the same transactions. Thus, the mere existence of state authority to tax does not deprive the Indian tribe of its power to tax." *Id.*, 455 U.S. at 151, 102 S.Ct. at 909. Neither do we believe the existence of tribal authority to tax deprives the state of its power to tax.

Third, there is no evidence that the state tax discriminates against interstate commerce. In our case, as in *Commonwealth*, the tax "is computed at the same rate regardless of the final destination of the coal, and there is no suggestion here that the tax is administered in a manner that departs from this evenhanded formula." *Id.*, 453 U.S. at 618, 101 S.Ct. at 2954. There is no differential tax treatment between in-state and out-of-state consumers.

■■■ Finally, we believe the amount of tax imposed is fairly related to the services provided to Cotton. The state tax need not reimburse the state for the exact cost of specific services provided to the mining company. *Commonwealth Edison Co. v. Montana.* Neither is there a requirement that the state's power to tax an activity connected to interstate commerce be limited to the value of services specifically provided to that activity. *Id.* Absent proof that the state tax disrupts or burdens interstate commerce in some way, we will not deprive the state of its authority to collect the tax. It is " 'not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business.' " *Commonwealth Edison Co. v. Montana,* 453 U.S. at 623–24, 101 S.Ct. at 2957 (quoting *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938)).

We believe Cotton reads too much into the footnote in *Merrion.* We are bound by the decisions of the United States Supreme Court. This court was chastised by the United States Supreme Court in *Ramah Navajo School Board, Inc. v. Bureau of Revenue* for failing to follow the Court's directives. We now decline to adopt Cotton's approach of comparing dollar-for-dollar benefits. Applying the traditional analysis of *Commonwealth*, we hold as a matter of law that the state taxes in question do not impose an impermissible burden on interstate commerce.[3] If the United State Supreme Court intended to invite a different analysis, the footnote Cotton relies on does not clearly reflect that intent. Until the Supreme Court instructs us otherwise, we will follow the pronouncement of *Commonwealth.* In so ruling, we recognize that the state too has a legitimate government interest in raising revenues. *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). Absent a showing by Cotton that this interest infringed on traditional notions of interstate commerce, we must affirm the district court.

While Cotton does not challenge the district court's conclusion on preemption, we feel constrained, in light of the Supreme Court's criticism in *Ramah,* 458 U.S. at 846, 102 S.Ct. at 3402, to discuss briefly the contentions made by the state and the Tribe.

■■■ The state argues that we should apply the traditional theory of preemption as used in Indian law. The preemption analysis requires an examination of three things: 1) the federal and tribal interests at stake; 2) whether the tax impacts those interests; and 3) whether the state interest justifies the impact on the other interests. Under this traditional preemption analysis, if the taxes do not impact the Tribe, we need look no further. The district court found, and Cotton did not seriously disagree, that the imposition of state taxes on Cotton did not impact the Tribe.

---

**3.** Following oral argument, Cotton moved to supplement its brief to cite authority that permits an appellate court to decide issues of fact where review is limited to documents. We granted the motion, however, in light of our decision, we find it unnecessary to decide the issue on the facts.

The Mineral Leasing Act of 1938 applies to the Tribe's oil and gas leases. 25 U.S.C.A. §§ 396a to 396g (1983). A major purpose of the Mineral Leasing Act is "to ensure that Indians receive 'the greatest return from their property.'" *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 767 n. 5, 105 S.Ct. 2399, 2404 n. 5, 85 L.Ed.2d 753 (1985). The "firm federal policy of promoting tribal self-sufficiency and economic development" is paramount to a preemption analysis. *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583 (footnote omitted). If, therefore, Cotton had demonstrated that the taxes imposed by the state interfered with the federal policy of promoting tribal economic development, the taxes would be preempted. We need not find that federal legislation *expressly* bars the state tax, only that the state tax conflicts with the policy underlying the 1938 Act. *Id.*

Under a strict preemption analysis, Cotton's claim would fail. Cotton, not the Tribe, pays the taxes in question. Neither does the record support a showing of interference with the Tribe's economic development or sovereignty. The Tribe's economic interests are not impeded in light of the fact that Cotton: 1) has drilled twelve new wells (direct testimony of Cotton's witness), 2) shows no signs of disrupting production because of the tax burden, and 3) reaps sufficient profits to pay taxes to the Tribe and state.

The Tribe concedes that state laws apply to non-Indians within the Reservation if the laws do not infringe on the Tribe's sovereignty and rights of self-government. Although the Tribe asserts that the multiple taxes interfere with the Tribe's right to increase its taxes and thereby raise revenues for governmental services, the Tribe cites no evidence for this claim. The record contains no evidence of an impact of tribal sovereignty; indeed, the Tribe imposes its own taxes, which are not challenged by Cotton. The Tribe's own consultant indicated that the Tribe could charge an even higher tax despite the state taxes imposed on Cotton. The Tribe also recognized that no taxing authority could return dollar for dollar in services the amount of tax revenues it received.

We hold that the state taxes challenged do not impede federal interests under the commerce clause. Nor would Tribal interests be affected under a preemption analysis. We therefore affirm the district court. We also reject the approach taken by Cotton to obtain relief from those taxes. Instead, we will apply a traditional analysis under Supreme Court guidelines to determine the validity of the taxes.

The judgment of the district court is affirmed.

IT IS SO ORDERED.

ALARID and APODACA, JJ., concur.